As applicable to this state of facts, we think the instruction is correct. It has reference to defects existing in the walk at different times, and not to different defects existing at the same time. The rule laid down by the instruction is that, while the town would be bound by notice of the defect communicated to a member of the town council, such notice must relate to the defects which caused the injury, and that notice to the councilman of defects which had been repaired before the accident occurred would not charge the town with notice of those which caused the injury, although they occurred at the place where the repairs had been made; and this rule is expressed with sufficient clearness. The jury could hardly have misunderstood the instruction, or placed the construction upon it of which counsel now contend it is capable. The judgment will be

AFFIRMED.

## THE STATE v. CROSS.

1. **Murder**: SELF-DEFENSE: EVIDENCE OF HOSTILITY ON PART OF DECEASED: TESTIFYING BEFORE GRAND JURY. On a trial for murder, where self-defense was relied on by the accused, evidence that the accused had testified against the deceased before the grand jury in a certain case *held* inadmissible to show the character and extent of the hostility of the deceased toward the accused, and the character of the attack made by the former upon the latter.

2. ———: INTENTION OF ACCUSED: EVIDENCE: STATEMENTS TO WIFE: RES GESTÆ. Where a person starts out of his house with a loaded revolver in his pocket, and proceeds directly to a fatal encounter with an enemy, there is some ground for suspecting his motives in any statement which he may make to his wife showing that he is bound on an innocent errand; but, where such statement is strictly a part of the *res gestæ*, it must be admitted in evidence for what it is worth.

3. ———: SELF-DEFENSE: EVIDENCE: ANGRY LOOKS OF DECEASED PRIOR TO OVERTAKING THE ACCUSED. Under the circumstances of this case, (see opinion,) evidence that the deceased had an angry countenance just

before overtaking the accused and engaging in the encounter in which he was killed, *held* improperly excluded, when offered by the accused in support of the theory of self-defense. *State v. Sullivan*, 51 Iowa, 144, distinguished.

4. ——: ——: ——: INFORMATION AND ADVICE AS TO DANGER TO BE APPREHENDED FROM DECEASED. Evidence that a fellow-citizen of the parties informed the accused that the deceased was much incensed toward him (the accused) and was a powerful and quick-tempered man, and that he advised him (the accused) to be prepared to defend himself, *held* inadmissible to support the theory of self-defense.

5. ——: ——: ——: ANGRY APPEARANCE OF DECEASED. The testimony of defendant that the deceased appeared angry while conversing with him about three years prior to the homicide, *held* properly stricken out.

6. ——: ——: ——: NEWSPAPER COMMENTS. Evidence that the newspapers had commented upon a case in which the accused had testified against the deceased before the grand jury, *held* not admissible to prove the hostility of deceased toward the accused.

7. ——: EVIDENCE: HOW WOUNDS PRODUCED: NON-EXPERT. A non-expert cannot be allowed to testify how certain injuries on the person appear to have been made. He can only describe the injuries.

8. ——: ——: THREAT BY ACCUSED: DENIAL AND EXPLANATION: REBUTTAL. Where a witness testified on behalf of the state that the accused had threatened to take the life of the deceased, and the accused, as a witness, not only denied this testimony, but said that the witness made certain statements in response to which the remark, construed by the witness as a threat, was made, *held* that it was the right of the state to prove by the witness that she did not make the statements attributed to her.

9. ——: SELF-DEFENSE: EVIDENCE OF INFIRMITY OF DECEASED. The fact that the deceased had an infirmity, shown by the fact that he wore a truss, was immaterial for the purpose of rebutting the theory of self-defense, where it was not shown that the accused had any knowledge of the infirmity.

10. ——: EVIDENCE: HYPOTHETICAL QUESTION TO EXPERT: MUST BE BASED ON EVIDENCE OF FACTS. Hypothetical questions to experts should be based on facts which the evidence tends to prove.

11. ——: ——: APPEARANCE OF WOUND: COMPETENCY OF MEDICAL EXPERTS. Medical experts *held* competent to testify, from the appearance of a wound through the hand, whether or not it was made while the hand was pressed over the muzzle of the revolver.

12. ——: OF ONE PHYSICIAN BY ANOTHER: EVIDENCE OF ILL-FEELING OF DEFENDANT TOWARD OTHER PHYSICIANS. Where defendant

was on trial for the murder of a fellow physician, and the theory of self-defense was interposed, *held* that it was error to admit evidence on the part of the state showing that the defendant, soon after the homicide, used profane language expressive of his contempt for the remaining part of the medical fraternity in the city where he lived, and where the the deceased had lived.

13. **Evidence:** PRESUMPTION TO IMPEACH TESTIMONY OF WITNESS. A barber testified that a witness, who came to his shop to be shaved, made statements while there contradictory to those made by him on the witness stand. *Held* that such testimony could not be rebutted by evidence that the witness' brother kept a barber shop in the same city, where the witness had an arrangement to get shaved for nothing.

14. **Depositions:** TAKEN IN OTHER STATE: INSUFFICIENT CERTIFICATE OF NOTARY: EVIDENCE OF LAWS OF SISTER STATE. A commission to take depositions on behalf of defendant was directed " to any notary public in and for the county of Baltimore and state of Maryland." The person who took the depositions designated himself in his official certificate as " a notary public of the state of Maryland, duly commissioned and qualified, residing in the city of Baltimore and state of Maryland." A motion was made to suppress the deposition because not taken before a person to whom the commission was directed. Defendant filed the affidavit of a practicing attorney of the state of Maryland, showing that a notary public of the city of Baltimore was a notary public of the whole state of Maryland. *Held* that the affidavit was properly stricken from the files, because not competent to prove the statutes of the state of Maryland; (Code, § 3718;) and that the deposition was properly suppressed, under the rule of *Plummer v. Roads*, 4 Iowa, 587, and *Jones v. Smith*, 6 Id., 229.

15. **Criminal Evidence:** GOOD CHARACTER AS MATTER OF DEFENSE: WHAT ADMISSIBLE. A defendant in a criminal case may prove not only his general good reputation in the community, but also his good character as a fact within the knowledge of the witness. *State v. Sterrett, ante,* 76, followed.

16. **Murder:** INSTRUCTION: LYING IN WAIT: NO EVIDENCE TO SUPPORT. An instruction in relation to murder committed by lying in wait *held* erroneous, because there was no evidence of lying in wait, within the proper meaning of the words.

17. ———: SELF-DEFENSE: WHEN STATE HAS BURDEN OF PROOF. When the question whether the homicide was justifiable on the ground of self-defense arises on the state's evidence, the burden of proof is on the state to show that it was not justifiable, and the jury should be so instructed. Accordingly, under the evidence in this case, (see opinion,) *held* that it was error to neglect so to instruct. ADAMS, J., entertaining a different view as to the effect of the evidence, not concurring.

18. ———: SELF-DEFENSE: PROVOCATION OF ASSAULT: INSTRUCTION. If one invite or provoke an assault to be made upon himself, for the purpose of securing a pretext or opportunity for killing the assailant, the assault will furnish no justification or excuse for the killing; and in this case *held* that the evidence (see opinion) justified the court in so instructing the jury.

19. ———: ———: NECESSITY OF KILLING ASSAILANT: INSTRUCTION DISAPPROVED. If a person who is assailed resorts to a deadly weapon to defend himself, and kills his assailant, his proved ability to protect himself by resistance or escape, or by calling others to his aid, and without resort to a deadly weapon, would be a circumstance against him, of greater or less weight, according to the facts, but would not necessarily be conclusive; and an instruction in this case (see opinion) to the effect that it would be conclusive held erroneous.

20. ———: ———: ———: ———. The court instructed the jury that "if the assailed make use of a deadly weapon against an unarmed adversary, at a time when said adversary is retreating, or being driven back, and when the advantage is with him (the assailed) without the use of such weapon, his act in resorting to the use of a deadly weapon, at such a time and under such circumstances, will be entirely inexcusable." *Held* that the instruction (the correctness of which was not questioned) was not without warrant in the evidence.

21. ———: LYING IN WAIT: DEFINITION: INSTRUCTION WITHOUT EVIDENCE. Lying in wait, as the term is used in law, is lying in ambush or concealment; and, as there was no evidence of such lying in wait, an instruction in regard thereto should not have been given.

22. ———: SELF-DEFENSE: INSTRUCTION DISAPPROVED. An instruction to the effect that if the jury found *all* of the several matters relied upon by defendant, as showing that the homicide was committed in self-defense, to be true, they should acquit, *held* erroneous, because they might properly have found him not guilty if they had found a *part* of those matters to be true. For instruction see opinion.

## *Appeal from Mills District Court.*

### SATURDAY, DECEMBER 19.

In December, 1883, the defendant, Dr. E. D. Cross, was indicted by the grand jury of Pottawattamie county for the crime of murder in the first degree. A change of venue was taken to Mills county, and a trial had, which resulted in a conviction and sentence of death. The defendant appeals.

*N. M. Hubbard, Wright, Baldwin & Haldane* and *John Y. Stone,* for appellant.

*A. J. Baker, Attorney-general, Sapp & Pusey* and *D. B. Dailey,* for the State.

ADAMS. J.—On the twenty-fourth day September, 1883, about six o'clock in the evening, Dr. A. B. McKune, a resident of Council Bluffs, was killed upon one of the streets of that city, within sight of several persons, by a revolver held in the hand of the defendant. The evidence tended to show that the deceased and the defendant had for some time been enemies. That the defendant purposely killed the deceased we do not understand has ever been denied by him, but he contends that it was in self-defense. A large number of errors have been assigned upon the admission of evidence offered by the state, and upon the exclusion of evidence offered by the defendant, and upon instructions given. It is also contended that the evidence that the homicide was justifiable was such that the court should have instructed the jury peremptorily to render a verdict for the defendant.

I. As to the evidence introduced to show that the homicide was justifiable, we have to say that, upon a separate reading, we have all reached the conclusion that the defense is not so clearly made out that a peremptory instruction in the defendant's behalf upon that point would have been proper.

II. The defendant, while a witness upon the stand in his own behalf, was asked by his counsel a question, in these words: "State whether or not you were ever called before the grand jury of Pottawattamie county, in December, 1880, to give testimony as to a crime alleged to have been committed by Dr. McKune?" This question was objected to by the state as immaterial, and the objection was sustained. The defendant contends that the question should have been

1. MURDER: self-defense: evidence of hostility on part of deceased: testifying before grand jury.

allowed.   The purpose of asking the question does not appear very clearly upon its face; but it is claimed that the defendant, if he had been allowed to testify upon the subject, would have shown, not only that he was called before the grand jury, but that he testified, and that his testimony was unfavorable to the deceased, and that the jury would have been justified in inferring that the deceased had a motive for attacking the defendant and putting his life in peril, and that, if he had the motive, he did attack him and put his life in peril.   But, in our opinion, it would have been going too far to have admitted such evidence.   In the first place, we are not able to say that, where a person is charged with crime, there is a natural presumption that he cherishes a hostility against those who testified honestly against him before the grand jury.   In the second place, if we should hold that there is such presumption, we could not presume that he would allow himself to be so far influenced by his hostility that he would put himself in such attitude toward the witness that the witness would be justified in killing him. It is true that where a homicide is committed it is allowable for the state, after proving the homicide, to prove, in connection with other facts tending to inculpate the defendant, that he had a motive to commit it, as bearing upon the question of intent; but the fact that a homicide had been committed could not be proven by evidence of a mere motive. Perhaps the defendant's counsel would concede that the mere existence of a motive on the part of deceased to attack the defendant would not tend to prove that he did.   But it is contended that there was other evidence tending to show that the deceased attacked the defendant, and the position of the defendant's counsel, if we understand them, is that the evidence in question would have tended to show the character and extent of the hostility of the deceased, and so would have tended to show the character of the attack.   This position of the defendant's counsel may, we think, be met substantially by what we have already said.   Truthful and hon-

est testimony, given before a grand jury, and especially if given compulsorily, ought not to create hostility towards the witness on the part of the person charged; and we should assume quite too much if we should hold that the fact of the giving of such testimony was admissible, even for the purpose of showing that a given attack on the witness by the person charged was of a more dangerous character than it otherwise would appear to be. *State v. Sullivan*, 51 Iowa, 144. In our opinion, the evidence was properly excluded.

III. The wife of the defendant was examined as a witness in his behalf. For the purpose of showing that the defendant, when he left his house, just before he killed the deceased, did not start out with the purpose of committing murder, the defendant's counsel asked the witness a question in these words: " What statement did the doctor make to you at the time as to where he was going, and what was he going for?" The state objected to the question, and the objection was sustained. It is contended by the defendant's counsel that the statement was a part of the *res gestæ*, and that the evidence of it should have been allowed. The defendant, when he went out, took a loaded revolver with him, and walked rather slowly along the street where deceased usually walked at that hour in going from his place of business to his house. It was claimed by the state that he went out for the purpose of seeking a hostile meeting with the deceased. To rebut the evidence relied upon by the state, that the defendant was seeking a hostile meeting, he offered to prove by his wife the statement in question. That it was allowable for the defendant to show, if he could, that he started out on an innocent errand, there can be no doubt whatever, nor do we understand that the counsel for the state claim that there is. Their proposition is that the statement is not a part of the *res gestæ;* but, in our opinion, their position cannot be sustained. Where an act is done, and the actor at the time of the act makes a statement explanatory of it, the statement is admissible as a part

2. ———: intention of accused: evidence: statements to wife: res gestæ.

of the *res gestæ*, unless the circumstances are such as to preclude the supposition that the statement was free from sinister motives.    Where a person starts out of his house with a loaded revolver in his pocket, and proceeds directly to a fatal encounter with an enemy, there is some ground for suspecting his motives in any statement which he may make to his wife showing that he is bound on an innocent errand.    It is hardly to be supposed, if he meditated murder, that he would disclose such fact to his wife, but would account to her for his contemplated absence upon a different ground.    But there is a natural presumption in favor of truth, as there is in favor of innocence, and in our opinion there is nothing in this case that would justify us in saying that the defendant's statement, being strictly contemporaneous with the act in question, and explanatory of it, did not constitute a part of the *res gestæ*.    We do not say that the evidence if admitted would have been of much weight, or would probably have been so regarded by the jury, but we cannot sanction the exclusion of any evidence to which the defendant was entitled.

IV.    The defendant introduced as a witness one Mrs. Sarah Brooks, and proved by her that she met Dr. McKune just before the fatal encounter; that she was acquainted with him, but did not speak to him. The defendant then offered to prove by her that there was a scowl on Dr. McKune's face, and that his looks were angry.    The state objected to the evidence, and the objection was sustained.    The object of the offered evidence was to show Dr. McKune's state of mind just before the encounter, for the purpose of raising the inference that he put the defendant in danger, and justified him in killing the deceased in self-defense.    To justify a person assailed in killing his assailant, there must be on the part of the assailed a reasonable apprehension of loss of life, or of great bodily harm.    The difficult question of fact, if any, in this case was to determine whether the deceased or the defendant was the assailant; and, if the former, whether there was such a reason-

*3. ——: self-defense: evidence: angry looks of deceased prior to overtaking the accused.*

able apprehension on the part of the latter as made the homicide excusable. The evidence shows pretty clearly that, just prior to the fatal shot, the deceased and defendant were engaged in a fight with their fists and hands. As evidence that the deceased was the assailant, the defendant relies upon what seems to be the undisputed fact, that they were walking in the same direction, and the deceased overtook the defendant. He also relies upon the fact that, after the encounter, the mark of a blow was discovered upon his head behind the ear. But there is some evidence that, when first seen, they were standing very near each other in conversation; and it is undisputed that the deceased was wholly unarmed, and the affray occurred in daylight, on one of the frequented streets of Council Bluffs, and when five or six or more persons were in sight. There was considerable evidence as to the relative position of the parties during the fight which preceded the shot, but it is by no means clear that the deceased was the assailant, or, if so, that the defendant had a reasonable apprehension of a loss of life, or of great bodily harm.

To aid him in his defense, he undertook to show facts which preceded the fatal meeting. One of them was the angry looks of the deceased at the time he met and passed the witness Mrs. Brooks. The defendant contends that if the deceased was already angry, and so much so as to be noticeable by an acquaintance who passed by him, such fact would tend to support his theory that the deceased was the assailant, and, indeed, that the jury would be entitled to interpret everything which was done in the light of such fact. Under ordinary circumstances it could not, of course, be inferred that when a person is seen walking upon a street with an angry countenance he is angry towards a person who might happen to be walking ahead of him. But it is shown that the deceased was gaining upon the defendant; that he overtook him in the course of a minute or two; and almost instantly was engaged in a fight. While it is not certain that the deceased was following the defendant in a state of anger

towards him, and with the purpose of overtaking him, or that he was thinking of the defendant at all, yet we think that the circumstances were such that the angry appearance of the deceased immediately preceding the encounter was not wholly without significance.  The case is distinguishable from *State v. Sullivan*, above cited.  It follows that, in our opinion, the court erred in excluding the evidence.

V.  The defendant called as a witness one Stone, who appears to have been a person of some character and influence, of long residence in Council Bluffs, and offered to show by him certain communications made by him to the defendant for the purpose of putting him on his guard against Dr. McKune.  The communication was as follows:  That he (Cross) had taken part in an indictment against Dr. McKune, and it was his duty to tell him that there was a great deal of excitement about it in the community; that it had been published in the papers, and that Dr. McKune was much incensed about it; that the witness knew that Dr. McKune was a very powerful man, and a very quick-tempered man; and that he (the witness) was advised by those who knew him that he (Cross) was in danger, and that he advised him to prepare to defend himself.  The court rejected the offer, and refused to admit the evidence, and the ruling is assigned as error.  The communication, when analyzed, consists of two parts,— information and advice.  The information was that Dr. McKune was much incensed towards the defendant, and was a powerful and quick-tempered man; and the advice was that he should prepare to defend himself.  The defendant contends that this information and advice were well calculated to excite his fears, and that his fears had much to do with the question of his reasonable apprehension.  But, in our opinion, his position cannot be sustained.  We think that the rule contended for would be more mischievous than can well be described.  The world is full of men towards whom some one is angry, and sometimes angry men give way to

4. ——:——:
——: information and advice as to danger to be apprehended from deceased.

their passions so far as to commit an assault and battery; but it does not follow that every man who knows that he is the object of some one's anger is justified in construing an assault and battery inflicted by the angry person into something furnishing an excuse for taking the life of an assailant. This is not the law anywhere. It is simply the code of barbarism, which has no existence except in bad men's minds. If the defendant was assailed by Dr. McKune at all, he knew very well then that his assailant was angry. He did not, in order to discover it, need to recall the information given him by the witness Stone. He had better evidence of it than any man's word would have been. As to the previous enmity existing between these parties, we have to say that we think that the evidence shows that the defendant knew it perfectly well. At all events, the defendant thought he knew it. This is proven by undisputed evidence. But we do not sustain the court's ruling upon this ground. There is nothing in the knowledge, or supposed knowledge, of the fact that could justify the defendant in construing an assault as dangerous which did not otherwise appear so. Nor do we think that the defendant was entitled to show what advice he received. The defendant was responsible for the correct exercise of his own judgment. The world is full of bad advice; and, ordinarily, there is none worse than that which leads the person advised to prepare himself to take human life. The courts have not gone further than to hold that it is competent to prove knowledge of previous dangerous threats, and of a violent and dangerous natural disposition. A person assailed by another, who has made dangerous threats which are known to the assailed, has some reason to suppose that the threats will be carried into execution; and a person who is assailed by another, who has a known violent and dangerous natural disposition, has some reason to suppose that the attack will partake of the character of the assailant's disposition. But the question before us is not of that kind. It is true that the offer was to show that the wit-

ness told the defendant that Dr. McKune was quick-tempered. But there was no evidence that Dr. McKune was so in fact. It is true also that the offer was to show that the witness told the defendant that Dr. McKune was a powerful man, but there is no evidence that he was more so than his size indicated. In our opinion, the court did not err in excluding the offered evidence.

VI. The defendant testified to the angry appearance of
5. ——: ——: Dr. McKune on a certain occasion when he was
——: angry
appearance conversing with him, about three years prior to
of deceased. the homicide. The evidence was stricken out, and we think correctly. See *State v. Sullivan*, above cited.

VII. The defendant offered to show that what was called the *Delia Nicholson Case* was a subject of comment in the
6. ——: ——: newspapers. The court excluded the evidence,
——: news-
paper com- and we think correctly. The case was one in
ments. which the defendant had testified against Mc-Kune before the grand jury. The defendant's theory is that the newspaper comment must have inflamed Dr. McKune's anger, and that the assault made by him, if any was made, was dangerous in proportion to his anger. But we see nothing in the evidence from which the jury would have been justified in drawing these inferences.

VIII. The defendant offered to show by a non-expert how
7. ——: evi- certain injuries on the defendant's person appeared
dence : how
wounds pro- to have been made. The court excluded the evi-
duced: non-
expert. dence, and we think correctly. We think that the non-expert witness could not, properly, more than describe the injuries.

IX. One Mrs. Ballard, as a witness for the state, testified, in substance, that some time prior to the homicide she heard
8. ——: ——: the defendant threaten to take Dr. McKune's life.
threat by ac-
cused: denial The defendant in his testimony denied that he
and explana- had made such threat. He then testified that
tion : rebut-
tal. Mrs. Ballard said to him that Dr. McKune was liable to poison his well, and burn his barn, and have some

injury done to his house, and make an attempt upon his life; and that he replied to her that he would try to take care of himself, and did not make any threat, except that he would defend himself, if attacked. Afterwards the state was allowed, against the defendant's objection, to recall Mrs. Ballard, and show by her that. she did not tell the defendant that Dr. McKune was liable to poison his well, burn his barn, etc. In this we see no error. If the defendant had confined himself to a simple denial, there would have been nothing to rebut. But he testified to what he said, and also to what she said, as something to which what he said was a reply; hoping, doubtless, that the jury would believe that she, through mistake or otherwise, had perverted the conversation. We think it was entirely proper to allow her to deny the statements attributed to her.

X.   One Harle testified that he took . a truss from the deceased's body. The defendant moved to exclude the evidence, and the court overruled the motion. The fact that deceased wore a truss might be a circumstance tending to show that the deceased was not as strong physicially as his size would indicate. But it was not shown that the defendant knew that Dr. McKune was subject to any infirmity. He could not, therefore, estimate his danger with reference to any such fact, and we think that the evidence should have been excluded.

9. ——: self-defense: evidence of infirmity of deceased.

XI.   The defendant introduced as a witness one Derkson, and showed by him that after the encounter there was a wound upon the defendant's head, and that his skull was mashed in. On cross-examination the witness said: "I did not say that his skull was broken,—it was somewhat pushed in." It was also stated by defendant's counsel that they did not claim that the skull was fractured. The state called several medical experts, and asked them a hypothetical question, based upon the theory that the witness Derkson had testified that the skull was fractured. They answered the question, and showed

10. ——: evidence: hypothetical question to expert: must be based on evidence of facts.

very clearly that the defendant could not have exhibited the strength and appearance which he did if his skull had been fractured. The defendant contends that the question asked was an improper one. Whether a human skull can be mashed in without being fractured we do not undertake to say; but we think that the hypothetical question should have been based merely upon the language used by Derkson.

XII. The evidence shows that the ball which killed Dr. McKune must have passed through the defendant's hand. He testified that his hand was tightly clasped over the muzzle. Such fact, if it existed, tended to corrobate the defendant's testimony that there was a struggle between him and the deceased over the possession of the revolver. But the wound was a small and clean one, and medical experts were permitted to testify that if the defendant's hand had been pressed tightly over the muzzle the explosion would have torn and lacerated the hand. It is insisted that this was not a subject for medical expert testimony; but, in our opinion, it was. The profession certainly has occasion to treat gun-shot wounds, and must be presumed to know the difference in the appearance of a wound made by a ball and powder and of one made by a ball alone.

*11. ——: ——: appearance of wound: competency of medical experts.*

XIII. One Guittar, the sheriff of Pottawattamie county, was with the defendant immediately after the homicide, and while the defendant was dressing the wound in his hand. The state called the sheriff as a witness, and put in evidence the conversation between him and the defendant at that time. The counsel for the state asked the witness this question: "What was said, if anything, by you about his having assistance to dress his wound? What did he say in reply?" The defendant objected to the evidence, and the objection was overruled. The witness answered as follows: " I asked him the question, ' Doctor, hadn't you better go after some doctor to dress your wound?' He made the answer, 'No; damn these doctors! I don't want to have anything to do with them.'"

*12. ——: of one physician by another: evidence of ill-feeling of defendant toward other physicians.*

Upon what theory this evidence was offered by the state, and admitted by the court, does not clearly appear. It tended to show that the defendant was a profane man, and was in a bad state of feeling towards the remaining part of the medical fraternity in Council Bluffs. But he was not on trial upon such a charge, nor would the facts, if proven, tend to show that he did not kill Dr. McKune in self-defense. Possibly the evidence tended to show that the defendant had not received as severe an injury as he claimed. But if it was the desire of the state to merely show such fact, we think that the inquiry should have been confined to the fact that he refused aid in dressing his wound. The showing of the use of profane language, and of a feeling of hostility towards his brother physicians, was well calculated to prejudice the defendant, and should not, we think, have been admitted.

XIV.   One Taylor was called as a witness for the defendant.   He testified, in substance, that he was an employe in a livery-stable not far from where the homicide occurred; that just before the shooting he saw the deceased following the defendant on a dog-trot, and saw him go up behind the defendant, and strike him, and that he afterwards struck him in the face, and then he saw and heard the shooting. The state then showed by one Lotz, a barber, that Taylor came into his shop to be shaved a day or two after the homicide, and stated that he did not see the shooting; that he was in the livery-stable at the time; and that, upon hearing the shooting, he ran out. Taylor was recalled, and denied that he was shaved in Lotz's shop; and, in corroboration of his denial, the defendant offered to show that Taylor had a brother in Council Bluffs who was a barber, and with whom Taylor had an arrangement to shave for nothing. The court refused to admit evidence of such arrangement, and we think properly. Taylor might go into Lotz's shop to be shaved notwithstanding such arrangement. We do not think that it would tend to show that he did not.

XV.   The defendant sued out a commission to take the

13. EVIDENCE: presumption to impeach testimony of witness.

deposition of certain witnesses residing in the city of Baltimore.

**14. DEPOSITIONS: taken in other state: insufficient certificate of notary: evidence of laws of sister state.** This commission was directed "to any notary public in and for the county of Baltimore and state of Maryland." The depositions were taken by Murray Hanson, who designated himself in his official certificate as a notary public of the state of Maryland, duly commissioned and qualified, residing in the city of Baltimore and state of Maryland. The state moved to suppress the depositions on the ground that they were not taken before a notary public "in and for the county of Baltimore, state of Maryland." In resistance of this motion, the defendant filed the affidavit of a practicing attorney of the state of Maryland, who swore that he was acquainted with the law of that state regarding the appointment of notaries public, and that a notary public of the city of Baltimore is a notary public of the whole state of Maryland. On the motion of the state this affidavit was stricken from the files. The motion to suppress the depositions was also sustained. We think these rulings were correct. The powers and authority of a notary public of the state of Maryland are presumed to be defined by the statutes of that state; but the written law of another country or state cannot be proven by parol. Code, § 3718. The affidavit of the attorney was clearly not competent evidence of the facts sought to be proven by it. The ruling suppressing the depositions was in accord with the holding of this court in *Plummer v. Roads*, 4 Iowa, 587, and *Jones v. Smith*, 6 Id., 229. The state also moved to exclude certain interrogatories and the answers thereto con-

**15. CRIMINAL evidence: good character as matter of defense: what admissible.** tained in the depositions. The witnesses in these answers testified to the former good character of the defendant. The objection urged against the evidence was that it tended to prove the good character of the accused as a fact within the knowledge of the witnesses, and not his general reputation in that respect in the community. This motion was also sustained by the district court. As we hold that the depositions as a whole

were properly suppressed, the question as to the correctness of the ruling is of no material consequence at this time. In view of a retrial of the case, however, we deem it proper to say that in the case of *State v. Sterrett, ante,* 76, we held that evidence of this character was competent.

XVI. The court gave an instruction in these words: "The statute enacts that murder which is perpetrated by

16. MURDER: instruction: lying in wait: no evidence to support.

lying in wait is murder in the first degree. This is so because the act of lying in wait for the purpose of accomplishing any specified act indicates design, premeditation and settled purpose to do the act; and, if you believe from the evidence that the defendant knew what the habit of McKune was in going back and forth, and that defendant loitered along the street thinking McKune would shortly come that way, and waited for him with the intention of drawing him into a controversy, and taking his life, and if the defendant did take his life in pursuance of such plan and purpose as this,—the crime will be murder in the first degree, and it will be immaterial who in fact opened the conflict by striking the first blow." The giving of this instruction is assigned as error. We are agreed that there was no evidence of lying in wait within the proper meaning of those words, and that the instruction, for that reason, should not have been given. The majority think that there was no evidence of the other fact which the instruction called upon the jury to determine. The writer of this opinion and Mr. Justice REED think there was evidence of such facts.

XVII. The court instructed the jury that "the plea of 'not guilty' put upon the state the burden of showing by

17. ———: self-defense: when state has burden of proof.

satisfactory evidence—*First,* that the defendant did, in the manner substantially as charged in the indictment, take the life of the said A. B. McKune; and, *second,* that the killing was done under such circumstances as rendered the act felonious and criminal." The giving of this instruction is assigned as error. It is

insisted by the defendant that the jury should have been told in the instruction that to justify a verdict of guilty the jury should be satisfied from the evidence of the defendant's guilt beyond a reasonable doubt. But the jury was fully and properly instructed elsewhere upon the rule as to reasonable doubt, and there is nothing inconsistent with it in the instruction in question. It is insisted, however, by the defendant, that the instruction is wrong in that the jury was not told in it that the burden was upon the state to prove that the homicide was not committed in self-defense. The majority of the court think that the defendant's position must be sustained. They do not wish to be understood as holding that if the evidence introduced by the state had no tendency to show that the homicide was justifiable, the burden would be on the state to show that it was not justifiable. On that point they express no opinion, because they think that, as the evidence which established the killing also showed that the defendant and the deceased were engaged in a struggle when the fatal shot was fired, and as the state did not, by any direct evidence, show which of the parties was the aggressor, the question whether the homicide was justifiable arose upon the state's evidence; and, as a consequence, that the burden of proof on that question was on the state, and that the jury should have been so instructed. The writer of this opinion thinks the jury could not properly have been so instructed. He does not think that any evidence introduced by the state tended to show that the homicide was justifiable; and, such being his view of the evidence, he thinks it would have been error to instruct that the burden was on the state to prove the negative proposition that the homicide was not justifiable. *Rex v. Woodfall*, 5 Burr., 2661; *U. S. v. Taintor*, 2 Green, Crim. R., 241; *Head v. State*, 44 Miss., 731; *Com. v. Drum*, 58 Pa. St., 9; *State v. Hays*, 23 Mo., 287; *Com. v. Webster*, 5 Cush., 295; *People v. Schryver*, 42 N. Y., 1; *Silvus v. State*, 22 Ohio St., 90. It may be thought that a different rule is held in *State v. Morphy*, 33 Iowa, 270, and *State v.*

*Porter*, 34 Id., 140. What precisely is to be regarded as the scope of those rulings does not seem to be entirely clear; but, in view of the weight of authority as to what the rule is as to the burden of proof, where there is no evidence introduced by the state tending to show that the homicide was justifiable, the writer of this opinion cannot think that those rulings were designed to apply to that kind of a case. It seems incredible that the court designed to hold a rule contrary to such numerous and respectable decisions without making any reference to them.

XVIII. In the fourth instruction given the court said: "If one invite or provoke an assault to be made upon himself, for the purpose of securing a pretext or opportunity for the killing of the assailant, the assault will furnish no justification or excuse for the killing." The giving of this instruction is assigned as error. We do not understand that it is denied that the proposition is a correct rule of law. But it is said that there is no evidence upon which the instruction could properly be based. In our opinion, there was such evidence. We will not undertake to set it all out. One of the witnesses testified that the defendant, referring to Dr. McKune, said: "I will harass him—bother him—until we get into a quarrel. I will make him strike me, and get the better of me, and then I will shoot him, and I will make out that I had to do it, and I will go scot-free." We find him after that walking one of the frequented streets of Council Bluffs in daylight, armed with a loaded revolver; and we find him there walking slowly at a time when Dr. McKune might be expected to be walking there in the same direction; and soon afterwards a fight, though Dr. McKune was wholly unarmed, and an immediate pistol-shot, resulting in Dr. McKune's death; and we think, so far as the evidence shows, no call by Dr. Cross for help, nor attempt to escape.

XIX. In the same instruction the court said: "If one is attacked by a person not armed with any weapon of offense,

*Marginal note:* 18. ——: self-defense: provocation of assault: instruction.

and the person assailed is able to defend himself, from such attack without resort to the use of a deadly weapon; or if, being so assailed, he can retreat with evident safety; or if he can call to his aid other persons, and this is apparent to him,—these circumstances, or any of them, if they appear, will show the absence of any necessity for killing the assailant." The giving of this instruction is assigned as error. In our opinion, the instruction cannot be sustained. A person who is assailed might possibly be able to defend himself without resort to a deadly weapon, and yet he might have a reasonable apprehension of loss of life, or of great bodily harm. So there might be a case where he could call others to his aid, and yet have a reasonable apprehension that their aid would not be sufficient to protect him. It is, of course, the duty of a person when assailed to use all reasonable means to protect himself without resorting to a deadly weapon. But he is not bound to act with an infallible judgment. If a person who is assailed resorts to a deadly weapon to protect himself, and kills his assailant, his proven ability to protect himself by resistance or escape, or by calling others to his aid, and without resort to a deadly weapon, would be a circumstance against him of greater or less weight, according to the facts, but not necessarily conclusive.

XX. The court also instructed the jury that "if the assailed makes use of a deadly weapon against an unarmed adversary, at a time when such adversary is retreating, or being driven back, and when the advantage is with him, without the use of such weapon, his act, in resorting to the use of a deadly weapon at such a time and under such circumstances, will be entirely inexcusable." It is said that this instruction is erroneous, in that there is no evidence upon which it could properly be based. The evidence upon this point is certainly very slight, but we cannot say that there was not any. Miss Berger testified as follows: "They were near the fence, and moving downward

from the fence, so that one was driven off the sidewalk,—it was the bald-headed man. He (McKune) was pressed back toward the outer edge of the sidewalk." It was shown, also, that the course of the ball by which Dr. McKune was killed was downward.

XXI. The court gave an instruction in these words: "If the evidence is such as to satisfy you that the defendant lay in wait for the said McKune, or sought an opportunity to get into an altercation with him for the purpose of killing him; that he armed himself with a revolver to carry out that purpose, and, at the time and place in question, shot the said Mc-Kune,—the defendant's act in so doing was unlawful and criminal." It is said that there was no evidence upon which the instruction could properly be based. We think that the ordinary meaning of *lying in wait*, as the term is used in law, is lying in ambush or concealment. See Bouv. Law Dict. There was no evidence of any concealment on the part of the defendant, and we think that the instruction should not have been given.

*21. ——: lying in wait: definition: instruction without evidence.*

XXII. In the seventh instruction given the court referred to the several matters upon which the defendant relied as showing that the homicide was excusable, as committed in self-defense, and the court instructed the jury, in substance, that, if they found all these several matters to be true, the defendant was justified in taking the life of the deceased. The defendant contends that the instruction is erroneous, in that it carried an implication that the jury could not properly acquit unless they found *all* the several matters to be true, whereas the jury might properly have acquitted if they found *a part*, of them to be true. The instruction was upon the vital point of the case, and, in our opinion, it cannot be wholly approved. The instruction is in these words: "If McKune came up behind the defendant, and made a violent, sudden and unprovoked assault upon him, by striking him upon the head; that

*22. ——: self-defense: instruction disapproved.*

he followed this up by other blows upon the defendant's face; and that he seized the defendant by the throat, and choked him; and that he accompanied these acts with declarations to the effect that he would then and there kill the defendant; and if the injuries inflicted upon the defendant were of such a character, and the assault so vicious, that a man of ordinary courage and judgment, placed in defendant's situation, would have reason to believe that his life was about to be taken, or great injury about to be inflicted upon his person; and the defendant did so believe, and there appeared to be no other adequate means of escape or protection,—the defendant would be justified in using any weapon he might have at hand in his defense, and might take the life of the assailant in order to save himself." The rule of self-defense is well enough stated in the general terms used in the latter part of the instruction, but that rule is not allowed to stand by itself, but is coupled with what precedes. It would have been better, we think, to have stated the general rule of self-defense as a distinct proposition; then it would have been proper to refer to the evidence upon which the defendant relied as tending to bring him within the rule, and the jury might have been instructed that they should consider the evidence as bearing upon the question, and give it such weight as they thought it ought to have.

We see no instructions other than those noticed which appear to us to be erroneous. Some other questions are raised, but they will not probably arise upon another trial. It is claimed that the impeaching evidence was sometimes allowed without first laying the proper foundation. The rule upon this subject is a very familiar one, and, if it was not properly adherred to upon the first trial, it will probably be upon another. It is not important that we should say more. For the errors pointed out the judgment must be reversed, and the case remanded for another trial.

REVERSED.