## STATE OF IOWA v. HENRY WESTON, Appellant.

**Instructions:** HARMLESS ERROR. A refusal to instruct, on a prosecution for murder against a city peace officer for killing a man in attempting to arrest him while quelling a disturbance at a dance hall just outside the city limits, that the accused had the right to exercise the duties of his office outside the corporation limits, even if erroneous, is cured by giving an instruction to the effect that accused or any other person, might have lawfully arrested the deceased and taken him into custody if he was engaged in a breach of the peace.

*Appeal from Jackson District Court.*—HON. WILLIAM F. BRANNAN, Judge.

### TUESDAY, MAY 12, 1896.

THE defendant was indicted for murder in the first degree. He was convicted of manslaughter, and sentenced to imprisonment in the penitentiary for eighteen months, and he appeals.—*Affirmed.*

*D. A. Wynkoop* and *Eli Cole, Jr.* for appellant.

*Milton Remley,* attorney general, and *Levi Keek,* county attorney for the state.

ROTHROCK, C. J.—I. Counsel for appellee filed a motion to strike the evidence from the record, upon the ground that it was not preserved by a bill of exceptions within the proper time. The motion is overruled. There is doubt in our minds whether the motion is well taken, and as this is a criminal case, and the sustaining of the motion would not affect the result or conclusion, we have reached on the merits of the case, it is better that this disposition be made of the motion.

II.    There is much complaint made by counsel for the defendant in reference to alleged misconduct of counsel for the state, in the course of the trial in the district court.    This consists of improper remarks made in argument to the jury, and in alleged professional statements made by one of the counsel during his address to the jury.    We have examined these objections.    They are presented in such a way that it is very difficult to determine to what the objections relate.    Some of the alleged objectionable language was not properly made of record; and, even if it were, we do not think it would require us to reverse the judgment for the misconduct of counsel.    We have disposed of this question in this general way, because it would require many pages of an opinion to set out, discuss, and dispose of all the points made by counsel on this feature of the case.    The proper disposition of the matter demands no elaborate consideration.    The mere reading of the record discloses without question, that the defendant was fairly tried, so far as the acts and conduct of the prosecuting attorneys was involved.

III.    The indictment was for the murder of one Hiram Hoover.    It is conceded that Hoover was killed, and that he came to his death by being shot by the defendant with a revolver.    It is not claimed, in behalf of the defendant, that the fatal shot was accidental. The revolver was discharged by the defendant at the deceased, purposely and intentionally.    The defense relied upon is two-fold: (1) That the killing was excusable, as being in self-defense; and (2) that the defendant was a peace officer, and, while engaged in arresting the deceased for a breach of the peace, he was opposed with such resistance, that it was necessary for the defendant to kill or disable the deceased by the use of the revolver.    The appeal is presented to us upon an immense record.    The killing occurred at a ball, or

dance, and many of those present were examined as witnesses, so that the record shows that the taxable costs amounted to more than one thousand four hundred dollars. The manner in which the case is presented in this court has made it necessary to examine and scrutinize the evidence very closely. In the opening statement of the argument in behalf of the appellant, facts are stated which we do not find in the record, and the affray which led up to the homicide is described apparently without much regard to the testimony of the witnesses. As an example, in the statement of facts it is said the deceased was in the act of striking defendant, when defendant drew his revolver, "and ducked his head" to avoid the blow aimed at him, and fired the shot. This is stated as though it was an established fact in the case. An examination of the record shows that there was a very decided preponderance of evidence that the defendant shot the deceased in the back, when he was six or seven feet away from him. We merely mention this as an instance of the extravagant claims made in behalf of the defendant. We will now proceed to state the actual facts in the case as shown by the testimony of the witnesses. It appears that there is a place in the suburbs of the city of Bellevue called "Harmony Park," which is owned by a number of citizens of Bellevue, and it is used as a pleasure resort. There is a building in which there is a dance hall, a ticket office, music stand, and a bar-room. There was a ball appointed for that place on the night of December 30, 1893. It does not appear that invitations were issued, nor that the dance was expected to be a select gathering. So far as is shown, it was free for all. The crowd collected, and the dance proceeded, and the bar was in full operation, doing a business which appeared to be satisfactory to the proprietors and the customers. Indeed, the evidence tends to show that

the bar was well patronized. The defendant was
city marshal of Bellevue. Harmony Park was out-
side the corporate limits of the city, but the defend-
ant attended the dance for the purpose of keeping
order, and at the Harmony Park dance he was armed
with a revolver, and he carried what is known as a
"policeman's billy." Another man, named Evans, was
present, who was sworn in as a special policeman, to
aid in maintaining peace and order. The deceased
was a common laborer. His usual occupation was
running on the river as a raftsman in summer, and
chopping wood in winter. He was married, but for some
time before the ball at Harmony Park he lived separate
from his wife. He lived in Bellevue and attended the
dance on the night of December 30, 1893. The deceased
appeared at the hall rather late on that night. The
dance had commenced some time before he arrived.
There is some conflict in the evidence as to his con-
dition when he put in an appearance. It is quite evi-
dent, however, that he was intoxicated, and that he
continued in that state after he went there. He
pushed in past the ticket seller, and did not pay for
his admission. He took off his coat, and rolled up his
shirt sleeves, and staggered around among the people.
After a time he put on his coat. While his wife was
on the floor dancing, he approached her and put his
hand on her shoulder, and turned her around. He did
not injure her, and it does not appear that she made
any complaint of his treatment of her; but his con-
duct was an annoyance to the dancers, and others
present. The defendant and the special policeman
(Evans) interfered, and demanded that Hoover should
keep quiet, and not disturb the ball. A personal col-
lission occurred between the officers and Hoover. It
does not appear that the deceased struck either of the
officers, but he resisted them, and it is probably fair
to say that he attempted to strike the defendant, but

he did not succeed in doing so. However, we do not regard that as material. The defendant knocked Hoover down with his billy, and the evidence tends to show that he and Evans had Hoover down on the floor of the dance hall more than once. After getting on his feet, the parties passed towards the door leading into the bar-room, and about that time the deceased pulled the billy from the defendant's hands. They all crowded through into the bar-room, and Hoover was again thrown on the floor. He raised up, and about that time the fatal shot was fired. The ball from the revolver entered Hoover's body just below the left shoulder blade, and pierced his heart, and he died instantly. These are the general, and we may say undisputed, facts attending the tragedy. It is true that an ingenious argument is advanced by defendant's counsel in support of the claim that Hoover was in the act of striking the defendant when he was shot. This contention is founded upon the course of the ball after it entered the body of the deceased. But, however plausible the theory may be, it cannot overcome the well-established physical fact that the shot was fired at the back of the deceased, and some distance from him, and at a time when he was making no resistance; and, indeed, the jury were fully warranted in finding from the evidence, that the defendant followed out into the bar-room and shot the deceased after he had said that he would quit the disturbance, and that, when the revolver was in sight, and was drawn up to shoot, a bystander attempted to take it from the defendant, and thus prevent him from shooting the deceased. It is to be conceded that there is a decided conflict in the evidence as to what occurred during the disturbance. This probably arises from the fact that beer was flowing freely at the park, and many of the witnesses were under its influence, and did not remember the facts alike.

In *State v. Mahan*, 68 Iowa, 304 (20 N. W. Rep. 449) and (27 N. W. Rep. 249), it is said: "The law of self-defense is well settled in this state. The killing of an assailant is justified on this ground only when it is, or reasonably appears to be, the only means of saving the life of the one assaulted, or of preventing some great injury to his person." And see, also, *State v. Cross*, 68 Iowa, 180 (26 N. W. Rep. 62); *State v. Shelton*, 64 Iowa, 333 (20 N. W. Rep. 459; *State v. Maloy*, 44 Iowa, 104; *State v. Jones*, 89 Iowa, 182 (56 N. W. Rep. 427). The court fully and correctly instructed the jury upon the law of self-defense, but complaint is made because the court did not, in its instructions, direct the jury that the defendant had the right to exercise the duties of his office outside the corporate limits of the city of Bellevue. The following (among other) instructions, were given, as to the right and authority of the owners of Harmony Park and their agents, to maintain order at the dance: "(42) It was the duty of the proprietor of said park to see that good order was maintained during the continuance of the dance or ball, to quell all disturbances, and to protect, as far as lay in their power, any one present at it, and taking part in the dance, from assault or violence. They had the right to remove from the premises any one who was creating disturbance, or making assault upon any one present, and this they could do by force. To secure good order, and to prevent tumult and disturbance, they had the right to employ such persons as they deemed necessary and proper for such purpose. (43) The defendant, it is undisputed, was, at the time of the homicide, marshal of the town of Bellevue, and the said park, it appears, was just outside of the corporate limits of said town. As marshal of the town of Bellevue, the authority of the defendant as a peace officer would not extend beyond its corporate limits; but, while this

may be true, yet, if he was employed by the proprietors of said park to be present at said dance to aid in preserving peace and good order, and was there for that purpose, to that extent, he would be representing the proprietors of the park, and could exercise such power as they could in these particulars—that is, in maintaining order and removing disorderly persons. But, independently of all this, any private individual would, under the law, have the right to arrest without warrant, and take into custody, any one who was at the time engaged in a breach of the peace." It will readily be seen that these instructions required the jury to regard the defendant as authorized, by reason of his appointment, by the proprietors of the place, or independent of any appointment, to arrest the deceased and take him into custody, if he was engaged in a breach of the peace. The effect of the instructions was to give the defendant power and authority in making an arrest, the same as if his jurisdiction extended beyond the corporate limits of Bellevue. The court further instructed the jury, in substance, that if it was the purpose of the defendants to arrest and remove Hoover, and he resisted the defendant, then he had the right to use such a degree of force as was reasonably necessary to reduce him to submission; and, if the resistance was violent and determined, the defendant was not required to make nice calculations as to the degree of force necessary to accomplish the purpose. These and other instructions are in line with well settled rules of law defining the means which may be employed in making arrests. To excuse the taking of life in making an arrest, it must be shown that the killing was necessary to effect the object. Some of the cases upon the subject go to the extent of holding that, to excuse the taking of life, it must appear that it was absolutely necessary, in order to make the arrest and secure the

prisoner. See 1 Am. & Eng. Enc. Law, pages 745–746. As there is no evidence in this case that any such necessity to take life existed, we express no opinion as to what will excuse the killing of a person by one making an arrest.

Other questions are discussed which are not of sufficient importance to demand special mention. The judgment of the district court is AFFIRMED.