STATE OF IOWA, Appellee, v. HOMER RUTLEDGE, Appellant.

**Murder:** EVIDENCE: CONCLUSION.  On a prosecution for murder it
1  is proper for the defendant to show, on the cross-examination of a witness for the State who has given the details of the affray, that he did not indulge in any quarrelsome language prior to the killing.

**Evidence:** IMPEACHMENT.  A defendant should be permitted to
2  show that a witness for the State was hostile and had endeavored to intimidate other witnesses.

**Self-defense:** EVIDENCE: RES GESTÆ.  Under a plea of self-defense,
3  defendant is entitled to show that immediately after the killing he surrendered himself, and that he stated he was acting in self-defense as part of the *res gestæ.*

**Same.**  A defendant accused of murder may show in support of a
4  plea of self-defense that deceased was a strong, robust man and when angry would use dangerous weapons.  He may also show how the wound causing the death of deceased was made; that his own character is that of a peaceable citizen; and he may show what was said by participants in the affray at the immediate time; but the widow of deceased should not be permitted to state the number and ages of her children.

**Evidence:** MOTION TO STRIKE.  An objection that the answer of a
5  witness is not responsive is only available to the party propounding the question.

**Production of witnesses:** ILLNESS: EVIDENCE.  On an issue as to
6  the physical ability of a witness to attend the trial, evidence that three weeks prior a commission reported that the witness was physically able to attend was immaterial.

**Character of witnesses:** EXAMINATION.  On a cross-examination of
7  witnesses for the State defendant may show their bias and hostility.

**Evidence.** A witness cannot state who was to blame in instigating an affray which results in a murder; but defendant may show, under a plea of self-defense, why he inflicted the mortal wound, and why he threw away the weapon used.

**Self-defense:** INSTRUCTION: DUTY TO RETREAT. Where defendant's evidence tended to show that deceased attacked him with a deadly weapon on his own premises after warning to keep away, or was about to so attack him when he killed the deceased, the defendant was entitled to an instruction that if the jury found such to be the fact he was not compelled to retreat but was justified in standing his ground.

**Instructions.** When the court attempts to instruct on any subject it should cover it fully.

**Same.** An instruction which has the effect to minimize the testimony of certain witnesses is erroneous.

*Appeal from Appanoose District Court.*—HON. F. W. EICH-
ELBERGER, Judge.

MONDAY, OCTOBER 21, 1907.

DEFENDANT was indicted for murder, and upon trial to a jury was convicted of manslaughter, and from a judgment of imprisonment for five years in the penitentiary appeals.
— *Reversed.*

*Howell & Elgin,* for appellant.

*H. W. Byers,* Attorney-General, and *Chas. W. Lyon,* Assistant Attorney General, for the State.

DEEMER, J.— Something like one hundred and sixty-one errors are assigned, and it is manifest that in the course of an ordinary opinion we cannot consider all of them. The facts relied upon by the State are very succinctly stated in the brief filed by the Attorney-General, and we copy therefrom the following:

The defendant was a man thirty years of age, married, his wife being a sister of deceased, and resided in Centerville,

Appanoose county, Iowa. For some time previous to the
21st day of August, the defendant and deceased resided in
the same house. Just prior to the 21st day of August, the
defendant moved into other premises, and it appears from the
evidence that the defendant had accused the wife of said
Oliver Street of stealing some pillowslips. On the after-
noon of the 21st day of August, deceased, in company with
his wife, called at the home of defendant, at which time the
defendant, his wife, Eva, and John Street, her brother,
were just sitting down to the supper table. Oliver Street
did not go into the house of the defendant, but inquired
while standing at the door as to what defendant intended to
do about the statement he had made concerning the stealing
of certain pillowslips by Mrs. Street. The defendant replied
that he was not going to do a d—— thing about it, where-
upon the deceased remarked that he would go and would
soon return with Jacob Myers, the party who had told him
that the defendant had made the remark in question. The
defendant told Oliver to 'bring Jake Myers down, and I
will face him in it.' Before leaving, however, it appears
that the defendant and deceased had a few words, and that
John Street remarked that, if he (Oliver) did not go away,
he would have them both arrested.

It appears that, after the deceased had left the premises
of defendant, the defendant went to the home of William
Purkey for the purpose of getting a bucket of water, and
while there remarked in the hearing of Wm. Purkey, Alfred
Thomas, D. N. Thomas, Silas Thomas, Louis Purkey, and
others that he would have to hurry back home, as he was ex-
pecting trouble if the deceased and Jacob Myers returned,
and that if they did return some one would be hauled away.
After returning home, the defendant was sitting with his wife
within his doorway, when the deceased returned, and he
again asked defendant what he was going to do about the
remark he had made concerning the stealing of the pillow-
slips. Defendant replied that he wasn't going to do anything
about it more than he had done. Jacob Myers, mentioned
above, had just vacated the premises into which Homer
Rutledge had moved, and had not as yet taken away all of
his chickens; and there were a few pictures also remaining,
and he, together with his wife, Carrie, and son, Hepburn,
came to the Rutledge home at about the time Oliver made

his second call, for the purpose of getting his chickens and pictures which had been left there. One word brought on another, and the discussion became somewhat heated, whereupon John Street stepped up to Oliver and said that if this did not stop he would have them both arrested. Whereupon the deceased, Oliver Street, slapped John, and he and John became entangled in a wire clothes line and fell to the ground; Oliver Street falling on top of John. It appears that Jacob Myers attempted to pull Oliver off of John, but was not succeeding very well, when Homer Rutledge, the defendant, went over and took hold of Oliver and assisted in taking him off of John.

It further appears that, when Oliver was released from John, he and Jacob Myers clinched, and that the defendant took a few steps over to his residence and was standing at or near the door, and Oliver broke loose from Jacob Myers and staggered in the direction of the house. At this time the defendant, as shown by the record, took two or three steps in the direction of the deceased, and when they came together the deceased was cut across the abdomen by a razor held in the hand of the defendant; he having put the razor in his pocket some time previous to the cutting, and shortly after the cutting dropped said razor, where it was afterwards found.

Defendant's version of the affair is quite different. It is about as follows: For several months prior to the homicide deceased and defendant had not been on good terms. Deceased first visited defendant's house about supper time, apparently for the purpose of challenging a statement which he claimed defendant had made regarding the taking of some pillowslips by deceased's wife. Defendant denied having made the statement, but this did not satisfy the deceased, and he (deceased) abused the defendant, called him vile names, and broke up the supper. At this time he had a knife in his hands. Defendant ordered deceased off his premises, and told him to stay away. Deceased then spoke about getting Myers, to whom it is claimed defendant made the statement regarding the pillowslips and bringing him to defendant's place, and deceased then remarked that, if he

(defendant) denied making the statement by Myers, he (Myers) would pound him (defendant) into the earth. Defendant said again for deceased not to come back and not to bring Myers with him, for if he did it would only end in a row. Defendant claims that when the deceased left he said: "I will go away, but I will come back, and when I do it will be for trouble." About an hour after supper time, or about 8 o'clock, as some of the witnesses put it, deceased and Myers came back to defendant's premises and found defendant with his wife sitting on the front porch of their house. It is claimed by defendant that after deceased left and about supper time defendant's wife told her brother, John Street, who boarded with defendant, that if deceased (Oliver Street) came back that he (John) should go and get the marshal and have him arrested. When deceased came back defendant's wife said to John, according to defendant's version: "John, you go and do as I told you." John immediately said to his brother, Oliver (the deceased), when he (Oliver) appeared the second time, that he was going to have him arrested, and thereupon Oliver attacked John, knocked him down, and jumped upon him. Myers attempted to pull deceased off John, but, not being able to do so, defendant went to his rescue, and together they pulled Oliver off.

Defendant claims that he then went back to the porch of his house, and that Oliver immediately commenced a violent struggle with Myers and his wife, apparently to get loose to attack the defendant; that he finally got loose from Myers, and started for defendant with a knife in his hand; that defendant warned him to stay away, threw up his hands, and finally in self-defense struck or cut the deceased with a razor which he had in his hands, causing a wound from which deceased afterwards died. The State claims that deceased had no knife, and that he was not approaching defendant when he received the fatal wound. It further contends that when he (deceased) broke away

from Myers and his wife he was not approaching defendant, but that defendant rushed out where deceased was and inflicted the fatal wound. Defendant also claimed that deceased had a knife in his hand when he was struggling with his brother John, and that when he approached the defendant he (deceased) was apparently opening his knife. Defendant also claims that deceased was a strong, robust, quarrelsome, vindictive man, and that when in trouble he would use deadly weapons, and that he had made threats against him (defendant). The trouble occurred upon defendant's premises and within a few feet of his house.

Defendant filed a motion for a continuance, based upon the sickness of his wife, but this was overruled before the trial commenced. The trial lasted about three weeks, and during the trial this motion was renewed, and was again overruled. Because of the conclusion reached in the case, it is not important that we consider this ruling, save as it bears incidentally upon another matter. Almost countless errors are assigned in rulings on the admission and rejection of testimony, and to some of these we shall first give attention.

I. On cross-examination of one of the State's witnesses, who pretended to detail the whole affair, defendant's counsel asked him if he heard defendant use a single cross word to deceased or any word that sounded in a quarrelsome tone. Objection that it was a conclusion and incompetent was sustained. It should have been overruled, and the witness permitted to answer. *Rosenbaum v. Levitt,* 109 Iowa, 292; *State v. McKnight,* 119 Iowa, 79; *State v. Cross,* 68 Iowa, 187.

1. MURDER: evidence: conclusion.

John Street was a witness for the State, and defendant sought to show his interest in the case, his endeavor to intimidate witnesses for the State, and other matters tending to show hostility to defendant. This was not permitted, and in this there was error. *State v. Eiffert,* 102 Iowa, 188; *State v. Weems,* 96 Iowa, 426.

2. EVIDENCE: impeachment.

One Frank Taylor was called as a witness for the defendant, and defendant offered to show by him that within a minute after the cutting defendant ran past him (Taylor)

**3. EVIDENCE: res gestæ.** in a breathless condition, and stated that he had just cut Oliver Street, but that he had to do it, that Oliver was coming at him with a knife, that Oliver and Jake Myers had come down to do him up, and that Ol came at him (defendant) with a knife, and that he had to do it; that at the time defendant was running bareheaded, had a frightened appearance on his face, and was much agitated, and said he was going to town to give himself up. The defendant was also denied the right of showing what deceased said just before he started the second time for defendant's house. Defendant was also denied the right to show that defendant gave himself up to the constable, and, although the State was permitted to show part of what defendant said when he surrendered himself, he (defendant) was not permitted to bring out the whole of the conversation. Defendant gave himself up within three or four minutes after the affray, but was not permitted to show by the constable to whom he surrendered himself that he (defendant) was excited and breathless, and that he said he was compelled to cut deceased or be cut himself. These questions should all have been answered, and defendant permitted to show the facts, as they were all part of the *res gestæ*. *State v. Cross*, 68 Iowa, 186; *Alsever v. Railroad*, 115 Iowa, 338; *Rothrock v. Cedar Rapids*, 128 Iowa, 254.

Moreover, when one party inquires as to part of a conversation, the other is entitled to the whole thereof, bearing upon the same subject. Code, section 4615, and cases cited thereunder.

Defendant offered to show that deceased was a strong and robust man, but was not permitted to do so. He also of-

**4. SAME.** fered to show that deceased was a dangerous man, who would use weapons when angry or engaged in a difficulty, but this was denied him. The

rulings were erroneous. *State v. Hunter,* 118 Iowa, 683; *State v. Bone,* 114 Iowa, 537; *State v. Sterrett,* 68 Iowa, 76; State v. Cross, *supra.*

Defendant also offered to show by an expert as to how the wound deceased received might have been made; that is, by what kind of a blow or cut. This was erroneously denied. *State v. Seymour,* 94 Iowa, 699; *State v. Cross, supra.*

The widow of deceased was permitted to state, over defendant's objections, the number and ages of her children. This should not have been permitted. *State v. Kuhn,* 117 Iowa, 216. This is not permitted in a civil case for damages, and surely should not be in a criminal one. *Beems v. Railroad,* 58 Iowa, 150.

Defendant was not permitted to show his real character as to being a quiet and peaceable citizen. This was error. The court also denied defendant the right to show what Myers said when he came to defendant's premises. This was manifestly part of the *res gestæ,* and should have been admitted.

Upon the examination in chief of some of defendant's witnesses the court, on objection or motion of counsel for the State, struck out part of their answers as not responsive. 

**5. EVIDENCE: motion to strike.** This was erroneous. *Christensen v. Thompson,* 123 Iowa, 717. The party offering the testimony is the only one who may make such a motion.

After the trial had progressed something like three weeks, the defendant was permitted to show by a doctor, who was then attending his wife, that she was unable, because of her illness to appear and testify in **6. PRODUCTION OF WITNESSES: illness: evidence.** the case. On cross-examination, this doctor, over defendants objections, was asked about the finding of a commission of doctors appointed by the court some three weeks before to the effect that the woman was able to appear in court, notwithstanding the affidavit of her attending physician to the contrary. The State was

also permitted to show in rebuttal by the doctors appointed on this commission that some three weeks before the woman could appear in court, although she and her doctor had made affidavits to the contrary.   Defendant offered this testimony to explain the nonappearance of the wife, who was an eye-witness of the homicide.   Her condition three weeks before the trial was an immaterial fact as we view it, and the cross-examination of the doctor and the testimony in rebuttal was not only immaterial, but highly prejudicial.   That one is in good health at a given time is no evidence that three weeks thereafter he is also in good health.   True the trial court had found that before the trial commenced defend-ant's wife was either simulating illness, or was not so sick as she thought she was; but that was on disputed testimony, and the question before the jury was her condition during the trial and some three weeks after the " commission " had examined her.

The trial court unduly restricted defendant's counsel in cross-examining character witnesses; erred in refusing de-fendant the right on cross-examination to show the feeling, bias, and hostility of the State's witnesses, and in denying defendant the right to show contradictory statements made by the wit-nesses for the State overlooking the fact that proper founda-tion was laid for impeaching purposes.   *State v. Richards,* 126 Iowa, 497, is authority for this proposition.

7. CHARACTER WITNESSES: examination.

A witness for the State was permitted to testify, over defendant's objections, as to who was to blame for breaking up the supper when deceased first went to defendant's house. This was manifestly erroneous.   Defendant offered to show why he threw the razor away with which he cut deceased, and as to why he had cut de-ceased, but this was not permitted, and in this there was error.   Surely, it was proper for defendant to show these facts.

8. EVIDENCE.

II.   The instructions are challenged, and error is as-

signed upon the court's refusal to give some of those asked
by defendant.    Defendant was upon his own premises and

9. SELF-DEFENSE:    was practically in his house or " castle " when
instruction:       the affray took place.    The trial court in its
duty to
retreat.           instructions covered the case so far as it re-
lated to self-defense, as if defendant were upon the high-
way or at any other place than his own dooryard.    It spoke
in a general way of defendant's duty to retreat when as-
sailed; that is, as to whether he or the deceased retreated
during the progress of the affray, and although specifically
requested by the defendant to charge that he (defendant)
was not under the circumstances compelled in any event to
retreat, but might stand his ground, failed to give the jury
any light upon this situation.    In this we think there was
error, as said defendant was upon his own premises and
practically in his own home.    He had warned deceased not
to come back, but in spite of the warning he came, and,
under defendant's version of the testimony, assaulted him
with a deadly weapon, or was on the point of doing so,
when deceased did the cutting.    In such circumstances, if
true, defendant was not compelled to retreat and was justi-
fied in standing his ground, and the jury should have been so
instructed.    *State v. Middleham,* 62 Iowa, 150; *State v.
Linhoff,* 121 Iowa, 637; *State v. Bennett,* 128 Iowa, 716.
Defendant's defense was based largely upon this proposi-
tion, and the point should have been specifically covered by
the instructions.

Testimony was adduced affecting the general moral
character of some of the witnesses, but the trial court in
referring to impeaching testimony failed to call the atten-

10. INSTRUCTIONS:    tion of the jury to the fact that this might
be considered as affecting their credibility.    In
attempting to instruct upon the subject, it was the duty of
the trial court to cover it fully.    This it did not do.

In instruction No. 28, in referring to the impeachment
of some of the State's witnesses by showing contradictory

statements, the trial court used this language: "Some of

11. SAME.

the witnesses have professed to detail certain conversations or statements made by other witnesses who have testified on the trial of this case." It then proceeded to state the rule as to admissions or declarations against interest. In this we think there was error. It has been held erroneous for a court to state that "some testimony has been introduced tending to show," etc. *State v. Donovan,* 61 Iowa, 369. The effect of the language used in the instruction given in the case at bar was to minimize the testimony by the suggestion that the witnesses simply professed to have heard conversations, etc.

An instruction assuming that there was no testimony of any acts of violence committed by the deceased was given. This was contrary to the evidence, and should not have been given.

Many other matters are argued, but to consider them all would unduly extend this opinion. Most of these will not arise upon a re-trial, and a great number are without merit. We find nothing further in the instructions which is subject to criticism, and the rulings on the motion to continue and on the motion for a new trial on account of misconduct of court and counsel are now of no consequence. There is sufficient evidence, if believed, to justify a conviction of defendant for some offense. Whether or not it is worthy of belief is for a jury, and not for this court.

For the reasons stated, defendant did not have a fair trial, and the judgment must be, and it is, *reversed.*