THE STATE OF IOWA, Appellee, v. DORCAS BRAZZELL, Appellant.

CRIMINAL LAW: Murder—Exclusively Circumstantial Cases—Instructions—Duty of Court. When the guilt of an accused depends *solely* on circumstantial evidence the trial court should observe the following *imperative* rules:

1. Distinctly inform the jury that the case rests solely on circumstantial evidence.

2. Distinctly inform the jury of the established and approved rules governing cases of exclusive circumstantial evidence.

3. Give no direction to the jury in regard to "direct" evidence.

PRINCIPLE APPLIED: 1. The following instruction was given in an exclusively circumstantial evidence case:

"The facts essential to establish the guilt of a defendant or any of such facts may be shown by evidence, either direct or circumstantial. Direct evidence is the evidence of witnesses to a fact or facts in issue of which they have knowledge by means of their senses. Circumstantial evidence is that which tends to establish a fact or facts in issue by proof of collateral facts, from which it may be reasonably and logically deduced that the ultimate fact or facts. exist which are thus sought to be established. In order, however, to warrant a conviction upon. circumstantial evidence alone the facts proved must not only be consistent with the guilt of the accused, but they must also be inconsistent with any other rational theory of her innocence."

*Held* erroneous because (1) it fails to distinctly inform the jury that the guilt of accused depended exclusively on circumstantial evidence and (2) confuses direct testimony of a mere collateral .fact or circumstance with direct evidence of the guilt of accused.

2. It was error to refuse the following:

"You are instructed, that where conviction of a crime is sought on circumstantial evidence, each circumstance necessary to reach a conclusion of guilt must be fully and fairly proven, and, if in considering any such necessary circumstances you have a reasonable doubt in your mind as to the evidence being sufficient to prove such ´circumstances, such doubt should be solved in favor of the defendant, and you should return a verdict of not guilty."

**HOMICIDE:  Evidence—Motive—Marital Relations.** Disturbed marital relations are relevant upon the question of motive in homicide prosecutions.

PRINCIPLE APPLIED: A wife on trial for murder of her husband. Evidence properly received, (1) That men might testify that they had ''visited'' defendant while her husband was away and had paid her money for something on such occasion, and (2) that several men were seen at different times to enter or leave the house when defendant was there alone.

Evidence improperly received: (1) That men had entered the alley, or were seen in the yard, near defendant's residence without more, and (2) that defendant had been seen in her own yard in her nightdress.

**HOMICIDE:  Evidence—Motive—Other Offenses—Duty to Limit.** Evidence tending to show immoral or immodest conduct or offenses other than the one for which accused is on trial (murder), if admissible in a proper case on the question of motive, imposes the duty on the court:

1., To specifically confine such evidence to its bearing on motive; and

2. To specifically tell the jury that the defendant's bad character, if such she had, was not evidence of guilt of the offense charged (murder).

**HOMICIDE:  Evidence—Conduct of Persons Other Than Accused.** The rule of law is yet unknown that justifies the reception in evidence, against an accused, of the acts, conduct, or appearance of one admittedly innocent of any connection with the crime.

**HOMICIDE:  Evidence—Sufficiency to Support Verdict—Motive.** The state must not rest alone on motive. In instant case evidence reviewed and held wholly insufficient to sustain a conviction for murder.

*Appeal from Dubuque District Court.*—HON. J. W. KINTZINGER, Judge.

TUESDAY, JANUARY 19, 1915.

THE defendant was indicted upon a charge of murder in the first degree and found guilty of murder in the second degree. Her motion to set aside the verdict and for a new

trial having been denied, she appeals.  The material facts are stated in the opinion.—*Reversed*.

*Fitzpatrick & Frantzen,* for appellant.

*George Cosson,* Attorney General and *Wiley S. Rankin,* Assistant Attorney General, for appellee.

WEAVER, J.—The appellant is charged with the murder of her husband, Charles Brazzell, at their home in the city of Dubuque on the evening of January 19, 1914.  There were no eyewitnesses of the alleged crime and the principal circumstances relied upon by the State to sustain the conviction are indicated in the further progress of this opinion.  At the time in question the parties had been married about eight years.  Appellant had been previously married and was by that marriage the mother of two children, a daughter and son.  The daughter, having graduated from high school and later from the State University, was engaged in teaching at Forest City.  During the years after she left her mother to attend school and up to the death of Brazzell she returned to the family home from time to time for her vacations.  The son also had gone out for himself.  So far as shown, the relations between deceased and his step-children were reasonably amicable and the daughter says that, as far as she had known, the appellant and deceased lived in harmony.  It appears, however, that prior to the alleged killing, word had come to the appellant of improper and questionable relations between her husband and other women, that her jealousy was to some extent aroused, and that she had frequently complained of his conduct in that respect.  On Saturday evening, January 17, 1914, it is said she followed her husband to the home of another woman where a scene ensued in which he struck appellant and she sought the police to have him and the woman arrested, but no arrests were made.  She requested the police to keep an eye on her home that night, expressing a fear that on his return, Brazzell might make her trouble.  A policeman

complied with her request but heard no disturbance about the premises. Deceased did not work on Monday, January 19th, and whether he worked on the preceding day, Sunday, the 18th, is not clear from the record. The house stands in close proximity to the residences of several neighbors, none of whom, so far as the testimony goes, saw anything or heard any noise suggestive of quarrel or strife between the parties on either Sunday or Monday. On Saturday evening, January 17th, the appellant's daughter at Forest City wrote to her mother saying among other things that while she was still busy with her regular work, she was in ill health and contemplated taking medical treatment and expressed a wish that her mother would make her a visit. The letter, which, with the enclosing envelope, is in evidence, appears to have been mailed at Forest City at 7:30 P. M. and addressed to the appellant at her proper street number in Dubuque. It was delivered to appellant on Monday morning, January 19th. Later in the forenoon appellant went to a neighboring coal office and ordered a load of coal to be delivered at the home. On the same trip she called upon the wife of a near neighbor. In the course of their conversation she related the fact of the trouble with her husband on the preceding Saturday evening but said they had made up and forgiven each other. At the same time she told of receiving the letter from her daughter and that she was going to Forest City to see her. At six o'clock in the evening she appeared again at the home of the same neighbor bringing her canary bird, asking that it be kept for her during her absence and saying she intended to take the evening train for Forest City. She further said her husband was willing she should go and had given her nine dollars for that purpose, but added that she did not know what "Charley might have up his sleeve," and asked them to keep an eye on the premises. After visiting some ten to fifteen minutes, appellant returned to her home and about a quarter to eight o'clock called at another neighbor's, dressed and prepared for departure upon her trip to Forest City.

She carried a suit case and a small package of lunch. While waiting she opened the suit case in the presence of her neighbor and put into it some fruit which one of the household was sending to her daughter. A little while before nine o'clock she went out, accompanied as far as the street by the neighbor, who saw her take the street car going in the direction of the railway station from which she took the train in the direction of Forest City at about 9:30 P. M. The woman upon whom the last call was made testifies that appellant appeared natural and cheerful in manner and betrayed no nervousness.

Her route was over the Illinois Central Railway to Iowa Falls, where she waited several hours between trains, thence to Forest City over the Rock Island Railway, arriving at her destination about ten o'clock A. M. Of what took place at Forest City we will speak later, it being enough at this point to say that she remained there with her daughter until Friday evening, January 23d, when she returned to Dubuque, taking the same route above described and reaching home about six o'clock of the afternoon of January 24th. Leaving the street car she walked to her home. As she entered the gate she was seen by two of the neighboring women already mentioned, who, after a few words of greeting, proposed to make her a cup of coffee, and appellant responded that she would go into the house and if Charley was not at home or there was nothing ready she would accept the invitation. The witnesses saw her approach her own door and they passed on to their own home. Appellant appears to have entered the house through a front door opening into a room known as the parlor. Circumstances indicate that she there set down her suit case, lighted a gas jet, removed her hat and laid it on the piano. The women who had invited her to refreshments say that within a minute or two after they entered their rooms they were followed by appellant apparently greatly excited, moaning and wringing her hands and exclaiming ''Charley is dead! Charley is dead!''

Before taking up subsequent developments it may be well

at this point to note what is shown as to the last which was seen of Charles Brazzell prior to the discovery of his dead body as just related. We have already said that he laid off from his regular employment that day but how he employed his time does not fully appear. The state's witness Ball, who knew deceased and was a fellow motorman on the street railway, testifies definitely to meeting and speaking with him on one of the streets of Dubuque at about a quarter to six on the evening of January 19th, from which point deceased moved in the direction of his home. Another state's witness met him earlier in the day. It would seem certain, therefore, that if deceased was murdered at his home on the date in question it must have been at some time later than the hour of six in the afternoon. Other state's witnesses living in the vicinity never saw him in life after the occasions above mentioned. There is evidence, however, tending to show that Brazzell was alive after Monday, the 19th of January. One Wm. Hos, a member of the family on whom appellant called just before leaving for Forest City and a witness for the state, testifies that he saw a light in the dining room and parlor of the Brazzell house for a considerable time on Tuesday evening. Mary Hos says that she saw the light there on Tuesday evening. Louis Hos, living in another house near at hand, swears he saw the light and to the best of his memory it was Tuesday night. One Duertscher, a grocer, testifying for the state, says appellant and her husband traded with him and that two purchases were made from him by the family on the week of January 19th, that one was made on Monday and the other later in the week, and of this he says that he is "positively certain," but he is unable to say by whom this purchase was made. One Wundiershied swears he saw a man dressed in the uniform of the street railway sweeping snow from the porch of the Brazzell house on Tuesday afternoon. Fred Lillie, brother-in-law of the appellant, swears he saw deceased alive on the street in Dubuque late in the afternoon of Tuesday, that he saw him clearly and he was walking in the direction of his home. The

state's witness Ball, who, as we have seen, says that he met deceased a little before six o'clock P. M. on Monday, the 19th, also says that he noticed that Brazzell was freshly shaved and the coroner who took charge of the body after it was found says the face showed a short growth of beard, possibly the thirty-second of an inch. Strangely enough there is no evidence upon the subject whether he appeared for work on Tuesday.

Resuming now the main thread of the story at the point where appellant made the outcry that her husband was dead, it appears that the alarm was at once given and many persons from that vicinity were soon at the Brazzell home. As is usually the case, under such exciting circumstances, these witnesses differ somewhat concerning the details of the situation thus revealed but there is substantial agreement upon most of the following matters.

The ground floor of the house is divided into four rooms, parlor, dining-room, bedroom and kitchen. The parlor and dining-room are in the front part, each having an outside entrance and one or more windows on the street. The kitchen extends across the back part of the house. Back of the parlor is a bedroom and between the bedroom and kitchen a steep flight of stairs, two feet four inches wide, affords access to the rooms above. The landing at the foot of the stairs is enclosed in a small hallway or vestibule two feet four inches in width and three feet four inches in length with doors connecting with the kitchen on one side and the bedroom on the other. A door opens between the bedroom and dining-room and another between dining-room and kitchen. There was a bed or sleeping couch of some kind in the bedroom. The dining-room was furnished with a stove, table, sewing machine and chairs. When, following the alarm, witnesses entered the building, the gas jet was burning in the parlor. Appellant's suit case was standing a little to one side where she apparently set it down as she lighted the gas, and her hat was on top of the piano. Passing into the bedroom the body of Brazzell was found on the floor. He was lying on his back with head

within perhaps two feet or less of the door opening into the hallway at foot of the stairs and his feet extended in the direction of the center of the room. Some of the witnesses think his head was in the hallway. The feet were bare and he was dressed only in an undersuit and an ordinary pair of overalls. His watch was on the mantel near the stove in the dining-room. His coat, shirt and vest hung on a nail behind the stove. By the side of the stove and near it were his shoes and stockings. The table cover was lying on top of the sewing machine. On the table were a pack of cards, dealt or scattered around, and a bottle containing a remnant of whiskey. The table was surrounded by chairs, one on each side. On the table in the kitchen was an empty beer bottle and several empty glasses. The condition of the bed in the room where the body was lying indicated that it had been occupied, some of the witnesses saying that it had the appearance of having been occupied by two persons.

On the floor of the dining-room near the door opening on the porch were pieces of unopened mail where they had evidently been slipped under the door by the letter carrier. In this mail was a letter written by the appellant from Forest City directed to her husband, apprising him of the time she expected to return.

There was a quantity of blood on the floor of the bedroom under and near the head of the deceased. There was no blood on his feet. In the blood near the head was one or two foot-prints, measuring ten and one-half inches in length and four inches across the ball and three and three quarters inches at the heel. The court ruled out evidence that this track had the appearance of one made by a man's overshoes. Of the existence of at least one track there seems to be no doubt. The blood at this point was dried or frozen and the track did not appear to be fresh. There was blood on the floor of the hallway and on the stairs up to the third step and a blood spot on the door opening from the hallway into the kitchen. At the top, the stairs land in a sleeping room and the opening

or well is not guarded by a rail. There was a bed in this room on which the covers were thrown back. There were no traces of blood found further up than the third or fourth step from the floor of the hallway. There was no broken furniture or other indications of a struggle unless it be in the fact that one chair was tipped back against the wall or table and a small splinter broken from one of the steps in the stairway. No weapon or instrument suggesting its possible use in a murderous assault was found anywhere about the premises.

The post-mortem examination revealed injuries upon the body as follows: A little above and to the front of the left ear the skull was crushed in upon the brain, the bone around this central point being splintered with a fracture extending therefrom upward to the top of the head. The scalp was not cut but the flesh around the seat of injury was bruised. The lower jaw bone on the left side was broken completely through in two places. Here also there was bruising but no laceration of the flesh. The upper jaw bone on the same side was broken in two with a fracture running latitudinally just below the nose. At this point there was a wound extending from the surface under the nose through the upper lip to the bone. The bone was so fractured as to be easily moved by the hand. There were two cuts on the back of the head, a complete fracture of the eighth, ninth, tenth and eleventh ribs, numerous bruises about the shoulders and back of the neck, and practically the whole lower part of the chest was caved in. The surgeons also noted some slight abrasion of the skin on one shin and at various other points upon the body.

In the opinion of the experts, unconsciousness and death from these injuries could not have been long delayed and probably both took place within an hour or less. They also expressed the view that the infliction of the injuries described required the exercise of great force. Testimony of the surgeon conducting the autopsy that in his judgment the

injuries described by him could not have been inflicted by a woman was at first admitted but afterward stricken out by the court. If not apparent from the statement already made, it should here be said that the deceased and appellant constituted the only members of the family living at home at the date of the alleged crime and no other person was living in or occupying any part of the premises.

We have also omitted to say at the proper place that the state offered the testimony of two women who claim to have seen the appellant on a street car on the evening of January 19th and to have noticed her nervous appearance and heard her ask if a change of cars was necessary in order to reach the Illinois Central station. Another woman, proprietor of a hotel in the city, testified that on the evening of Monday appellant appeared at the hotel and in a very excited manner asked for a room which was refused her.

She fixes the time as after nine o'clock, and probably a quarter after, and that the caller's stay in the office did not exceed five minutes. Neither of these witnesses had ever seen or known appellant before the night in question, and did not see her again until the trial. The description given by these witnesses of the woman they saw, her dress and her baggage, corresponds with nothing testified to by any other witness on either side of the case.

It appears without contradiction that appellant took a car upon a line with which she was entirely familiar, that the car so taken by her was due at the point where she entered it, at five minutes before nine and that she arrived at the station in time to take a train leaving at about nine-thirty. The alleged hotel incident appears to fit into no theory of this case advanced by either party. Of other matters of alleged fact, material to the disposition of this appeal, mention thereof will be made in connection with our discussion of the errors assigned.

The exceptions taken and points argued by counsel are entirely too numerous for us to attempt their detailed dis-

cussion, but having reached the conclusion that a reversal of the judgment below must be ordered we shall confine ourselves to a consideration of those features of the record which necessitate this result, making some reference also to certain questions, the decision of which may be of material importance upon another trial should one be had.

I. As will be seen from the statement we have made, the state's case rests solely upon circumstantial evidence. This in itself is no reason for setting aside a verdict of guilty. Crime, especially that which is deliberately planned, is ordinarily done stealthily and its unravelment and conviction frequently depend upon proof of incriminating circumstances rather than upon the testimony of eye-witnesses.

1. CRIMINAL LAW : murder : exclusively circumstantial cases : instruction : duty of court.

But the danger of being misled as to the existence of the circumstantial facts and the liability of mistake in the inferences to be drawn from established facts are such that the law has circumscribed and guarded their use by certain well established rules which courts are required to observe in the administration of justice. The only instruction given the jury by the trial court bearing on this phase of the case was in words as follows:

"Par. 33. The facts essential to establish the guilt of a defendant or any of such facts may be shown by evidence either direct or circumstantial.

"Direct evidence is the evidence of witnesses to a fact or facts in issue of which they have knowledge by means of their senses.

"Circumstantial evidence is that which tends to establish a fact or facts in issue by proof of collateral facts, from which it may be reasonably and logically deduced that the ultimate fact or facts exist which are thus sought to be established. In order, however, to warrant a conviction upon circumstantial evidence alone the facts proved must not only be consistent with the guilt of the accused, but they must

also be inconsistent with any other rational theory of her innocence."

In this same connection appellant requested several instructions to the jury of which requests we quote the following:

"4. You are instructed, that where conviction of a crime is sought on circumstantial evidence, each circumstance necessary to reach a conclusion of guilt must be fully and fairly proven, and, if in considering any such necessary circumstances you have a reasonable doubt in your mind as to the evidence being sufficient to prove such circumstances, such doubt should be solved in favor of the defendant, and you should return a verdict of not guilty."

This proposition in other and variant forms was repeated in still other requests and was in each instance denied. Nor was the thought or rule therein expressed embodied in any form in the charge given by the court upon its own motion.

There was prejudicial error both in the instruction given and in the refusal of appellant's request. The instruction given calls the attention of the jury to the subject both of direct and circumstantial evidence and undertakes to define each phrase. It contains no suggestion to the jury that they have to consider the case solely as one of circumstantial evidence and the jurors could hardly have avoided the conclusion therefrom that in the opinion of the court, there was direct evidence which they were bound to consider. This situation was emphasized by the instruction that "direct evidence is evidence of witnesses to a fact or facts in issue of which they have knowledge by means of their senses." To the apprehension of the average juror a fact in issue is any fact upon which there is a conflict of evidence between the contending parties and the definition given would to them appear to include testimony bearing upon the existence or nonexistence of the things relied upon as circumstantial evi-

dence, as well as testimony of eyewitnesses of the alleged crime. Under such instruction the jury may well have confused direct testimony of a mere collateral fact or circumstance with direct evidence of appellant's guilt. Hence, as there was confessedly no direct evidence of the crime, the jury should have been clearly so informed and the instructions should have been confined to the rules governing the proper consideration of a case of circumstantial evidence. As it was, the court did no more than to give a text book definition of circumstantial evidence and tell the jury that to convict thereon the facts shown must not only be consistent with the theory of guilt but inconsistent with any rational theory of innocence. This court has had quite frequent occasion to deal with the question thus raised.

Speaking of the same point raised in *State v. Blydenburg,* 135 Iowa, 264, 279, where it was held error for the court to refuse an instruction substantially the same as appellant's request No. 4, and to give an instruction like paragraph 33 above quoted, we said, ''We think the jury should have been distinctly informed that the state's case rested entirely upon circumstantial evidence and in such connection the established and approved rules governing cases of this class should have been clearly set forth.'' That ruling has since been repeatedly followed.

In *State v. Harmann,* 135 Iowa 167, 170, the refusal of an instruction such as was asked in this case was held error. The rule was re-stated in *State v. Harris,* 153 Iowa 592, and *State v. Clark,* 145 Iowa 731.

II.   Much evidence was introduced over the appellant's objection, the apparent purpose of which was to attack her moral character and show that she was a person of loose
2. HOMICIDE: habits. Of these witnesses, three men of self-
evidence: mo- confessed dissolute character were led to say
tive: marital
relations. they had each ''visited'' the defendant at her
house in the absence of her husband, and had given or paid her something on such occasions. Neither was asked or said

in unequivocal terms that he ever had intercourse with appellant, but from the statements above referred to and other suggestive collateral circumstances, the state sought to impress the jury with a belief of the appellant's incontinence, though the witnesses who knew the truth of the matter were not asked or required to state it.

The writer is fully persuaded that such testimony was not only incompetent but grossly unfair to the accused, but other members of the court hold to the view that the state was not required to ask such witnesses the direct question as to the real nature of their relations with the woman, but having drawn out the suggestive circumstances as hereinbefore indicated, the prosecutor could properly leave the jury to draw its own inferences. These remarks also apply to the testimony of several women living in the immediate vicinity of the Brazzell house concerning their alleged knowledge that several different men were seen at different times to enter or leave the house when appellant was there alone. The court, however, is united in the view that these witnesses were in many respects allowed to go beyond the proper limits of the most liberal rule of evidence and to detail mere matters of irrelevant gossip. For example, one woman was asked and permitted to say she had seen men enter an alley near the appellant's residence but she did not see whether they went to the house. Another woman had seen a man in the dooryard but did not see him go in the house and so far as developed, the appellant was not in his company and did not meet or see him.

Still another woman testified she saw the appellant at a very early hour in the morning clothed in her nightdress and barefooted and with her hair down her back standing on the sidewalk at her own gate silently watching her husband who had just started away to his place of work. This was long before Brazzell's death and is wholly unaccompanied by evidence of any kind tending to show that appellant had any sinister purpose in going out to the gate or that

a word was there spoken or an act there done by her inconsistent with her duty or loyalty to her husband.

It seems to have been cast into the case with other immaterial matter to impress upon the jury the idea that appellant was not a woman of fine sensibilities, or was lacking in womanly modesty of demeanor and therefore more likely to conceive and carry out the fearful crime with which she was charged. This is so clearly opposed to the fundamental principle that an accused person is not to be found guilty of an offense charged by proving his or her bad character or proof of other and independent specific acts of a reprehensible kind, that we will not take the time to cite authorities thereon. The piling up of irrelevant testimony of this nature with the approval of the court and against the vigorous objections of counsel could not fail to greatly prejudice the appellant's case in the minds of the jury, and this is the more emphatically true in view of the failure of the court to limit or restrict in any manner the application or effect of evidence tending to show appellant guilty of adultery. For, assuming the admissibility of such evidence, it is only to be considered for whatever it may be worth as showing the relations between the husband and wife and as bearing in some degree upon the question whether appellant had any disposition or motive which might prompt her to take her husband's life. It is not in itself evidence that she did kill him and in the absence of other testimony fairly tending to show her guilt, the showing of motive on her part, however strong it may be, will not justify her conviction.

For this reason, the court in admitting the evidence competent for that purpose, should have made it clear that the testimony impeaching the appellant's character for chastity was to be considered solely upon the question of motive and that her bad character was not evidence of her guilt of murder. In the absence of such guidance by the court, the jury is unlikely to make this very essential discrimination

3. HOMICIDE: evidence: motive: other offenses: duty to limit.

and is likely to give undue weight to the alleged moral delinquencies of the accused as affording sufficient ground upon which to hold her guilty of murder.

III.  The fact that appellant left Dubuque on the evening of January 19, 1914, and went to her daughter at Forest City is conceded.  The proof that the daughter had written

4.  HOMICIDE:
evidence: conduct of person
other than accused.

her mother a letter in which she suggested a desire that the mother visit her is direct and positive, and there is no evidence whatever to discredit it unless such conclusion is to be drawn from the testimony of the witness Hunt who was superintendent of the school at Forest City where appellant's daughter, Miss Cushman, was teaching.  He was called as a witness for the state and over the objections of the appellant testified that on the forenoon of Tuesday, January 20th, the appellant, whom he had not before met, came to his office in the school building and asked to be directed to Miss Cushman's room.  The witness went with her to the door of the room and opened it.  Miss Cushman was engaged with a class, having her back or side to the door.  From this point in the testimony the examination proceeded as follows, appellant objecting to each interrogatory:

"Q.  Now what if anything did you observe when you brought this lady into where Miss Cushman was?

"A.  As I opened the door Mrs. Brazzell was on my right hand in the hall and Miss Cushman, of course, as the door swung open, she turned facing this lady.  She turned and looked at the person, the lady looked at her.  I stood there for her to pass inside and she hesitated to go inside. I stepped into the room and said, 'A lady would like to see you.'  I stated that to Miss Cushman or words to that effect. Miss Cushman was still looking.  She neither smiled or frowned.  (This last remark was stricken out by the court.)

"Q.  How long did they look at each other?

"A. It was long enough to be noticeable. I would not attempt to say.

"Q. Then who spoke first, and what was said?

"A. Miss Cushman—after a few moments Miss Cushman walked between me and her mother.

"Q. What was the next thing done either by Miss Cushman or the other lady?

"A. Miss Cushman spoke in a low tone to the lady as she passed her, to step out into the hall. She walked into the hall. I walked around them and into the office on the other side. They were in the hall when I went into the office. I noticed they greeted each other with a kiss when they got into the hall."

This witness was further permitted to say that later in his presence at the house where he lived and Miss Cushman roomed, the latter in the presence of her mother said in substance that she did not know what she had said in her letter to indicate that she was sick. The evidence which we have here quoted, question and answer, we are compelled to hold incompetent. It was admissible for the state to prove that appellant went to Forest City and if there was anything in her conduct or bearing while there having any legitimate tendency to prove her guilt it was the state's right to show it by this or any other witness. But the point of the state's inquiries in this respect was directed not so much to the conduct, appearance and bearing of the appellant as that of her daughter, and because the latter, being unexpectedly interrupted at her class work by the entrance of her superintendent announcing that the lady in the hall wished to see her, did not instantly turn from her class and hasten to the hall but looked or stared briefly before moving to meet her visitor, it is gravely argued that this is a suspicious circumstance adding weight to the case against the appellant. Testimony as to the appearance of fear or fright or surprise upon the face of one charged with a crime, his apparent nervous-

ness, or otherwise, and his conduct in general is ordinarily held admissible though confessedly among the weakest and most unsatisfactory kinds of evidence known to law, but we think the door has never been opened so wide as to permit a charge of crime against one person to be established by proof of the conduct or the look upon the face of another against whom there is not the slightest ground to suspect · complicity in the offence.

Miss Cushman speaking for herself says of the incident connected with the arrival that she was conducting a recitation when Mr. Hunt opened the door and said she was wanted. Looking in that direction the hall was dark or dimly lighted and the woman standing there was behind, or partly behind, Hunt and she didn't at first recognize the person as her mother. She then put down her book, went to the hall and when she passed through the door she saw it was her mother and greeted her. Witness then took her mother into the recitation room until her class was dismissed when she conducted her to her own rooming place where she stayed until her return to Dubuque.

Whether this story be true or not it is a perfectly natural one and it is not to be impeached by the fact that there was a wait or hesitation "long enough to be noticeable" between the announcement made by the superintendent and her response thereto.

The exceptions taken to the rulings admitting this evidence must be sustained.

IV. Many other exceptions have been argued for the appellant. Some of these are not without merit but for the most part they come within the letter or spirit of the rules we have affirmed in the preceding paragraphs

5. HOMICIDE: evidence: sufficiency to support verdict: motive.

and do not require further consideration. Others are not well taken. There remains, however, the important question whether the evidence on part of the state is sufficient to sustain a conviction. The proportions to which this opinion has already

grown and the extremely voluminous record of a trial lasting many days and involving the testimony of nearly a hundred witnesses forbid any attempt on our part to here recite or even to epitomize the facts or alleged facts on which the prosecution rests its case, other than we have already mentioned, and we shall confine ourselves chiefly to a statement of our conclusions. We have studied the record with anxious care to ascertain all those matters which may be regarded as having any legitimate bearing upon the issues and to find whether, considered either severally or as a whole, they constitute a showing upon which a jury might properly be permitted to return a verdict of guilty and we are compelled to answer that inquiry in the negative and hold that the appellant's motion for a directed verdict should have been sustained.

This court does not, of course, attempt to say or find that appellant is innocent of the offense charged against her. That is not within our province. What we do find and hold is that the state failed to sustain its accusation by that measure of competent proof upon which a conviction can be allowed to stand. It will be admitted that the state did have evidence tending to show that appellant was jealous of her husband's attention to other women and that this had been the source of more or less discord between them. That this could properly be considered by the jury for what it was thought to be worth as tending to show motive on appellant's part, if there be other competent evidence fairly tending to show that she killed her husband, must also be admitted, although the natural inclination of a jealous wife having murder in her heart is perhaps to wreak vengeance upon the alleged paramour rather than upon her spouse. But to be entitled to demand a conviction at the hands of the jury, the state, as we have before said, must go further than to show a possible motive, or even a combination of motive and opportunity.

Motive is not an element of the crime of murder, nor, generally speaking, of any other crime, and crime is no less crime though no motive whatever be shown. In other words,

motive or lack of motive is neither more nor less than an evidentiary fact having more or less weight according to the other proved facts and circumstances with which it may be coupled. Assuming, therefore, that the jury might have been justified in finding a possible or probable motive for the alleged killing, the burden was still upon the state, in the absence of direct evidence of the criminal act, to gather and establish such an array of other relevant facts and circumstances so consistently pointing to the conclusion of the guilt of the accused and so inconsistent with any rational theory of her innocence that the impartial mind paying no heed to popular clamor or other extrinsic influences may thereby be convinced beyond a reasonable doubt of the truth of the charge made against her. In this we think the prosecution has clearly failed. Its own witnesses account for the existence in life of Charles Brazzell up to such an hour of the evening of January 19th and for appellant's whereabouts during so much of that evening before her departure for Forest City that it seems quite impossible that this woman should have had opportunity to assault and kill her husband, a stalwart man six feet in height, and in the prime of life, beating and mangling him in the most shocking manner, to then proceed to effectually conceal or dispose of the weapon or weapons employed in accomplishing the murderous deed, to remove from her person and clothing all the incriminating marks and signs, if any, which might afford a clue to her guilt, to cunningly arrange the furniture, clothing and other things in the bedroom, dining-room and kitchen in a manner to create the impression that a drinking and card playing bout in which several persons participated had preceded the death of the deceased, to dress and prepare herself for her intended journey and to appear at her neighbor's house ready for her trip to Forest City with no indication of excitement or nervousness. If not incredible the theory is at least so extraordinary that to permit its acceptance by the jury the state must be held to the duty of sustaining it by something

more than mere suspicion. Moreover, several of the state's witnesses testify to facts strongly tending to show that Brazzell was alive in Dubuque on Tuesday when confessedly appellant was some two hundred miles distant.

Indeed, it may well be said that the evidence on the part of the state taken as a whole is just as consistent with the theory that Brazzell met his death on Tuesday night as it is with the theory of his murder on Monday night. Indeed, the only evidence relied upon to show that his death occurred on Monday rather than Tuesday is the negative evidence of several of the neighbors that they saw nothing of him about the premises or about town on the day last mentioned.

Counsel for the state call our attention to various alleged incidents in the conduct of appellant after the death of her husband as indicating a consciousness of guilt. In some respects these criticisms are not borne out by the record and none of them is in any wise inconsistent with her entire innocence.

It may be suggested that the state is not conclusively bound by the testimony of its own witnesses and this is to a certain extent true, for it may, if it can, show by other evidence that a given fact is other or different than its witness has stated. It cannot, however, impeach the character or credibility of a witness whom it has itself produced and examined.

We think it unnecessary to pursue the discussion further.

It is proper in conclusion to say that while courts and public prosecutors are in duty bound to exercise vigilant care to enforce all laws against crime and see to it that penalties for public offenses are not evaded upon trivial or unsubstantial grounds, it is of no less importance that the individual citizen shall not be held to have forfeited life or liberty except upon due trial under the regulations and safeguards which the law has provided. In times of public excitement, and especially where the alleged crime is involved in mystery, it is not always easy to keep the scales evenly balanced or to

exclude from the minds of jurors all the influences which pervade the atmosphere in which a trial is held but in so far as the court can counteract these tendencies by excluding from the record all improper testimony and by carefully directing the jury concerning its duties, it should be unhesitatingly done and if in spite of such careful supervision a verdict is returned which is not fairly supported by the evidence it should be set aside.

For the reasons stated the judgment below is reversed and cause remanded for new trial. This order for a new trial is made in order that the prosecution shall not be prejudiced in the event it has new or additional evidence upon which a conviction may reasonably be expected, but in the absence of such condition we are of the opinion the case should be dismissed.—*Reversed.*

DEEMER, C. J., LADD, EVANS, PRESTON and GAYNOR, JJ., concur.