STATE OF IOWA, Appellee, v. E. B. (LASH) FERGUSON, Appellant.

No. 43587.

JANUARY 12, 1937.

REHEARING DENIED MAY 8, 1937.

McCoy & McCoy and R. J. Shaw, for appellant.

Edward L. O'Connor, Attorney General, Walter F. Maley, First Asst. Attorney General, and Harold J. Fleck, County Attorney, for appellee.

DONEGAN, J.—Under an information filed by the county attorney of Mahaska county, Iowa, the defendant, E. B. (Lash) Ferguson, and his son, Ben Ferguson, were jointly charged with the crime of larceny in stealing, taking and carrying away eleven head of cattle which were the property of Vernie Braden. The defendant, E. B. (Lash) Ferguson, was tried separately and found guilty, and judgment was entered upon the verdict thus rendered. From such judgment and rulings of the court, said defendant appeals.

I. In considering the alleged errors upon which defendant relies for reversal, we shall first take up the last of these alleged errors, because this alleged error goes to the facts of the case which it will be well to understand at the outset. The defendant lived at a little settlement known as Union Mills, in Mahaska county, where he had a pasture in which he kept cattle owned by him. Vernie Braden had a pasture about three miles east of Union Mills in which he pastured thirty-five head of cattle, twenty-three of which belonged to him. Thirteen of Braden's cattle were black. All of the thirty-five head of cattle were in the pasture on June 10, but on June 17, when Braden next visited the pasture, eleven of his cattle (nine black and two red) were missing. Between the defendant's pasture and the Braden pasture there is a road which extends southward from the defendant's pasture about a mile, then eastward for about three miles, then northward over a bridge across the north Skunk river. From the place where the road crosses the north Skunk river there is a road on which, by going northward, then westward, and then southward, one can go from the bridge to Union Mills. The Braden pasture was on the east side of the road where it crossed the north Skunk river, and just north of the north end of the bridge there was a gate opening into the Braden pasture. For quite a distance both north and south of this bridge and on both sides of the road there was considerable timber and brush. There was no house nearer than approximately one-fourth of a mile of the bridge, and neither the bridge nor the gate into the Braden pasture was visible from any of the houses in the vicinity. There is evidence tending to show that between about 11:30 o'clock in the forenoon of June 10, 1935, and sometime after noon on that day, the defendant, E. B. (Lash) Ferguson, was seen herding a bunch of cattle estimated variously at from 15 to 25 head along the east and west road which we have described as

extending between Union Mills and the bridge over the north Skunk river. When first seen along this road the defendant was perhaps a mile and a half to two miles south and west of the bridge. Between that point and the bridge he was seen by other witnesses, the last of these witnesses having seen him at a point a little more than a quarter of a mile south and west of the bridge. Some of these witnesses also saw the defendant's son, Ben Ferguson, riding in a gray colored automobile and apparently helping his father herd the cattle along the road. All of these witnesses state that at the time they saw the defendant herding his cattle, which was before the cattle crossed the bridge, there were no black cattle among them. There is further testimony that in the afternoon of the same day, E. B. Ferguson and his son were seen driving a bunch of cattle on the road north of the bridge, and that when first seen north of the bridge there were probably from eight to ten black cattle among the cattle in the herd. Between that time and seven or eight o'clock in the evening of the same day the defendant and his son, Ben Ferguson, were seen by several witnesses at different points along the road which extends northward and westward and then southward between the bridge and Union Mills, and these witnesses testify that the defendant and his son were driving a bunch of cattle estimated variously from 20 to 35 head, in which there were several head of black cattle. There is evidence that, on the same night, defendant's son, Ben Ferguson, called at the home of one Phillips, who conducted a trucking business at New Sharon, Iowa, and engaged Phillips to go to the defendant's place at Union Mills on the following morning to haul some stock. The testimony of Phillips shows that on the following morning he went to the defendant's place where eleven head of cattle, some black and some red, were loaded onto his truck; that he was directed by the defendant to haul these cattle to the sales barn at Toledo, Iowa, and that the defendant accompanied him in the truck to the sales barn at Toledo, Iowa, where the cattle were unloaded. There is further evidence that, while passing through New Sharon on the trip to Toledo, the defendant was seen in company with Phillips. While the man who received the stock at the sales barn at Toledo was not able to recognize the defendant as the person who came in the truck, he did testify that there was a man accompanying Phillips when the stock was delivered, and that this man told him to list the stock under the name

Moore. Later, on the same day, and before the stock was sold, one of the men connected with the sales barn was told to change the name under which the stock was listed to Ferguson. This instruction was given by another son of the defendant, Cleo Ferguson, who was acting as one of the auctioneers at the sales barn. The eleven head of cattle which came to the sales barn in the Phillips truck were sold on that afternoon, four of them being bought by a man connected with the sales barn, by whom they were later sold to another party. The pasture in which the cattle were kept was some distance from the Braden house and the cattle were not missed from the pasture until about the 17th day of June, when an investigation was started. Braden and the deputy sheriff of Mahaska county went to the sales barn at Toledo, and from there they were accompanied by a man connected with the sales barn to the places of the different farmers who had purchased the eleven head of cattle brought to the barn in the Phillips truck. Braden identified the cattle missing from his pasture among the cattle at the different farms visited, and all of the cattle thus identified by him were brought back to the sales barn and were later returned to the Braden farm. Settlement for the eleven head of cattle brought to the sales barn in the Phillips truck was made with Cleo Ferguson, a son of defendant. It is true, there was evidence presented by the defendant tending to show that he had black cattle among the cattle owned by him on and prior to the 10th day of June, and that he was not at Toledo, Iowa, at the time the State claimed he had gone there in the Phillips truck. There was further evidence tending to show that the defendant was a man of good character, and also evidence tending to impeach the witness, Phillips.

Appellant contends that the trial court erred in overruling the defendant's motion for a new trial on the grounds that the verdict was not supported by the evidence and was contrary to the weight of the evidence, and in refusing to submit instructions requested by appellant directing the jury to return a verdict for the defendant. We do not think there can be any doubt that the evidence, as a whole, was abundantly sufficient to sustain the verdict rendered by the jury, and the trial court did not err in refusing the instructions requested and in submitting the case to the jury.

■■■ II. Defendant relies for reversal upon error which he claims is found in the court's instruction on circumstantial evi-

dence, and in the court's refusal to give an instruction requested by him. The instruction given by the court defined both direct and circumstantial evidence and explained the difference between them. It told the jury that, if the facts and circumstances shown by such circumstantial evidence were sufficient to satisfy their minds of the guilt of the defendant, beyond a reasonable doubt, such evidence would be sufficient to authorize the jury to render a verdict of guilty. It further told the jury that to warrant a conviction, however, the facts and circumstances proved must not only be consistent with defendant's guilt but they must be inconsistent with any rational theory of innocence. The instruction on circumstantial evidence asked by the defendant and refused by the court contained the following statement:

"To warrant a conviction on circumstantial evidence, each fact in the chain of circumstances necessary to be established to prove the guilt of the accused must be proven by competent evidence beyond a reasonable doubt, and all the facts and circumstances necessary to prove guilt must be connected with each other and with the main fact sought to be proved; and all the circumstances, taken together, must be of a conclusive nature, leading to a satisfactory conclusion and producing a moral certainty that the crime charged was committed, and that the accused committed it. It is not sufficient that they coincide with and render probable the guilt of the accused, but they must exclude every other reasonable hypothesis."

Another requested instruction asked the court to tell the jury that "each circumstance essential to the conclusion of the defendant's guilt should be fully established in the same manner and to the same extent as if the whole issue rested upon it."

It is the contention of the appellant that the matters covered in the instruction requested were not submitted to the jury in the instruction given by the court, and that they were such as should have been given to the jury in connection with its consideration of circumstantial evidence. In support of this contention appellant cites State v. Blydenburg, 135 Iowa 264, 112 N. W. 634, 14 Ann. Cas. 443; State v. Clark, 145 Iowa 731, 122 N. W. 957; State v. Brazzell, 168 Iowa 480, 150 N. W. 683. Other cases were also cited which, in our opinion, do not go to the proposition here raised. In the Blydenburg case an instruction very similar to the instruction requested in this case was refused, but this

court found that the law as contained in the requested instruction had been substantially given in the court's instruction. The language used in that opinion indicates that particular stress was placed upon the fact that the instruction requested was proper in that case because all the evidence in the case was circumstantial. In the Clark case a general instruction was asked on the subject of circumstantial evidence, to the effect that every fact necessary to a conviction must be proved beyond a reasonable doubt. In that case, likewise, all of the evidence was circumstantial, including the evidence on the unexplained possession of recently stolen property, and, because of the importance of this circumstance, this court said that the jury should have been instructed that such fact must be proved beyond reasonable doubt, and that the instruction requested should have been given. In the Brazzell case the evidence was likewise entirely circumstantial and the court gave a general instruction covering both direct and circumstantial evidence, but refused to give an instruction that, where a conviction is sought on circumstantial evidence, each circumstance necessary to a conclusion of guilt must be fully and fairly proven and that, if there was a reasonable doubt as to the evidence being sufficient to prove such circumstances, the verdict should be, not guilty. The court's instruction was held erroneous because it did not distinctly inform the jury that the guilt of the accused depended exclusively upon circumstantial evidence, and because, under such instruction, the jury might well have confused direct testimony of a mere collateral fact or circumstance with direct evidence of appellant's guilt.

In the instant case, however, the evidence was not exclusively circumstantial. There was direct evidence that the cattle which were taken from the Braden pasture were the same cattle as those sold at Toledo on the 11th day of June, and there was the evidence of the truckman that these cattle were loaded by him at defendant's place, in the presence of and under the direction of the defendant, and that the defendant accompanied him in his truck from defendant's place of residence to the sales barn at Toledo. In its instructions the court fully instructed the jury as to the material facts that must be proved and that these facts must be proved beyond a reasonable doubt. It fully explained to the jury the meaning of the term reasonable doubt, and in its instruction No. 10, which is here attacked, it correctly defined

and described the meaning of direct and circumstantial evidence and told the jury that, in order to convict upon circumstantial evidence alone, the facts and circumstances must not only be consistent with defendant's guilt, but they must be inconsistent with any rational theory of innocence. We know of no case in which this court has held that, where the evidence is both direct and circumstantial, an instruction such as that given by the court is insufficient, and that it is error to refuse to give an instruction such as that requested by the appellant.

**III.** It is next claimed that the court erred in giving its instruction No. 11, which is as follows:

"The fact, if you find it to be a fact, that the cattle as described in the information were stolen from the premises of Vernie Braden and were soon thereafter found in the possession of the defendant, if so shown, may be considered by you as a circumstance tending to show that the defendant is the party, who took the cattle *unless such possession has been explained.*" (Italics are ours.)

The words which we have italicized have been printed in capitals in the appellant's argument, and these words appear to comprise the part of the instruction upon which particular stress is laid as being prejudicial. The argument appears to be that, because the appellant in this case denied the possession of the stolen property and did not attempt to make any explanation of the possession of such stolen property, the use of the phrase containing the words italicized was erroneous and prejudicial. According to appellant's contention, if the last phrase in reference to an explanation had been omitted, the instruction would have been appropriate to the facts of this case; but, because the defendant attempted no explanation, it is prejudicial to make any reference to an explanation. Our attention is called to the case of Richardson v. State, (Tex. Cr. App.) 42 S. W. 996, which seems to have adopted this rule; but the appellant has not cited, and our attention has not been called, to any other case in which such a rule has been followed. The instruction here involved does not, in our opinion, put the burden of explaining possession on the defendant. In effect, it does no more than tell the jury that the unexplained possession of stolen property soon after the theft thereof may be considered as a circumstance tending to show that the party in possession was the party who stole it.

The explanation of possession might come from defendant or it might come from other facts and circumstances in evidence. State v. Brady, 121 Iowa 561, 97 N. W. 62, 12 L. R. A. (N. S.) 199; State v. Perry, 165 Iowa 215, 145 N. W. 56; State v. Fortune, 196 Iowa 995, 195 N. W. 740.

**** IV. It is next contended that the court erred in its instruction No. 13, on good character, and in refusing instructions on this matter requested by the defendant. The court's instruction No. 13 was as follows:

"You are instructed that in passing upon the guilt or innocence of the defendant, good character, if you find such good character as to morality and honesty has been established by the evidence, constitutes an ingredient to be considered by you without reference to the apparently conclusive or inconclusive character of the other evidence; and it is for you to determine what weight such evidence shall have with you."

Instruction No. 2 asked by the defendant was as follows:

"You are instructed that the good character of the defendant as it has been established may itself, in connection with all the evidence, generate a reasonable doubt and entitle the defendant to an acquittal, even though without such proof you would convict."

Instruction No. 6 requested by appellant contained this statement:

"You are instructed that the previous good character of the defendant, if proved to your satisfaction in this case, you ought to consider, together with all the other facts in evidence, in passing upon the question of his guilt or innocence, for the law presumes that a man whose character is good is less likely to commit a crime than one whose character is not good."

It will be noted that, in the instruction given by the court, the jury is merely told that, if they find that the defendant's character as to morality and honesty has been established, they may consider such evidence without reference to the conclusiveness or unconclusiveness of other evidence, and determine what weight they will give it. Nothing is contained in the instruction as to the purpose for which this evidence may be considered. The jury is nowhere told that, if they find that the defendant's

character for morality and honesty is good, they may consider such evidence in determining whether a man of such good character for morality and honesty would be apt to commit the crime with which defendant is accused. The jury is nowhere told that, if they find the defendant's character for morality and honesty to be good and, if in considering this evidence with other evidence in the case they entertain a reasonable doubt as to defendant's guilt because of his good character, they should acquit him. Whether the neglect to instruct in regard to these matters would amount to prejudicial error in the absence of any requested instruction in regard to them, we need not determine, because the defendant did ask the court to give such instructions. It is well established law that evidence as to good character may be considered by a jury along with all the other evidence, and that, in reaching a verdict, they may consider whether a man of such good character as they find the accused to possess would be liable to commit the crime with which he is charged. It is also well established law that, if the evidence as to defendant's good character, when considered along with all other evidence, causes the jury to have a reasonable doubt of the guilt of the defendant, they should acquit him. The instruction given did not convey this information to the jury, and the court refused to give the requested instructions, or their equivalent, in which this information would have been given to the jury.

Appellee contends that, in any event, there was no prejudicial error in the instruction given by the court, because all of the evidence of good character attempted to be shown by the appellant was insufficient for that purpose; because this evidence attempted to show a good reputation based merely upon the experience of the witnesses with the defendant; and because the evidence presented by appellee on rebuttal showed that the actual reputation and character of the defendant in the community in which he lived were bad. The matter here involved was not reputation merely, but the real character of the defendant. Such character, it is true, might be shown by general reputation, but it does not follow that it could not also be shown by actual personal experience of the witness with the defendant. State v. Sterrett, 68 Iowa 76, 25 N. W. 936; State v. Cather, 121 Iowa 106, 96 N. W. 722. We do not think it can be said, as a matter of law, that there was no evidence as to the defendant's reputation and character which the jury might consider, and we do

not think that the testimony offered by the appellee in rebuttal can be said to establish, as a matter of law, that the defendant's reputation and character were bad. We are constrained to hold that, in refusing to give the instructions requested by the defendant, or their equivalent, the court was guilty of prejudicial error. State v. Reynard, 205 Iowa 220, 217 N. W. 812.

■■■ V. In its instruction No. 9 the court, in defining reasonable doubt, among other things, told the jury that a reasonable doubt "means a doubt which without being sought after fairly and naturally arises in the mind after a careful and candid consideration of all the evidence in the case, both for the State and for the defendant." Immediately thereafter, in the same instruction, the court proceeded to tell the jury that, "If, after such careful and candid consideration of all of the evidence in the case, or lack of evidence, the minds and consciences of the jurors are not firmly and abidingly satisfied of the defendant's guilt, the doubt is a reasonable one and you should acquit." Appellant complains of the instruction given by the court and of the court's refusal to give an instruction asked by appellant which, among other things, told the jury that a reasonable doubt "means a doubt which, without being sought after, fairly and naturally arises in the mind, after a fair and candid consideration of all the evidence in the case, both for the State and for the defendant. If, after such consideration, the minds and consciences of the jurors are not firmly and abidingly satisfied of the defendant's guilt, the doubt is a reasonable one, and you should acquit. * * * A reasonable doubt may arise from the lack, or want of evidence, as well as out of the evidence in the case."

Appellant's complaint is that the first paragraph of the court's instruction which told the jury that a reasonable doubt is one which "naturally arises in the mind after a careful and candid consideration of all the evidence in the case, both for the State and for the defendant," did not tell the jury that such reasonable doubt might arise from the *lack or want of evidence* as well as from the evidence presented. The court's instruction plainly told the jury that if, after a consideration of all the evidence, *or lack of evidence,* they were not firmly and abidingly satisfied with the defendant's guilt, the doubt would be a reasonable one and they should acquit the defendant. We are unable to see why this statement does not as clearly convey to the jury the

thought that a reasonable doubt may arise from the lack of evidence, as does the statement contained in the instruction asked by the appellant. We think the objection is hypercritical. We find no error in the instruction given by the court or in its refusal to give the instruction asked by the appellant.

■■■ VI. Appellant complains of the ruling of the court in excluding the evidence offered by a witness in behalf of the defendant for the purpose of impeaching the state's witness, Harold Phillips, who testified to having hauled eleven head of cattle from defendant's place in Union Mills to Toledo.

The witness testified to an acquaintance with said Phillips, extending over a period of fifteen or sixteen years. He was then asked if he knew the reputation of Phillips in the community in which he lived for honesty, integrity and good citizenship. The question was objected to as not calling for any grounds of impeachment, and the objection was sustained. Defendant then offered to show that, if allowed to testify, the witness would answer that he knew the reputation of Phillips in the community where he resides for honesty, integrity and good citizenship, and that the witness would testify that such reputation is bad. To this offer the state objected on the ground that reputation as to the respects for which the testimony was offered, however bad, could not be considered as impeaching testimony under the statute. It is quite apparent that the testimony was offered as impeachment under section 11271 of the Code, which provides that "the general moral character of a witness may be proved for the purpose of testing his credibility." Our cases construing this statute hold that, while the words "general moral character" are used, the statute refers to general reputation and not to the person's character, as known to the witness, independent of his reputation. State v. Egan, 59 Iowa 636, 13 N. W. 730; State v. Seevers, 108 Iowa 738, 78 N. W. 705; State v. Gregory, 148 Iowa 152, 126 N. W. 1109.

The general moral character of a witness, whom it is attempted to impeach under this statute, should not be confused with the character of an accused when put in issue. As it is general reputation or general moral character that is referred to in the statute, the evidence as to such reputation is confined to general reputation and not to particular traits or characteristics. State v. Seevers, 108 Iowa 738, 78 N. W. 705; Kilburn v. Mullen, 22 Iowa 498; State v. Gregory, 148 Iowa 152, 126 N. W.

1109; 70 C. J. 820, 821, 907, 912. We find no error in the ruling of the court excluding the evidence of this witness.

■■■ VII. The defendant complains of the ruling of the court on the testimony of J. E. Seibert, a witness for the defendant, who offered to testify as to the general moral character of the defendant for honesty, integrity and good citizenship. The witness, Seibert, testified that he had known the defendant for thirty years. He was asked if he knew the reputation of the defendant in the community where he resides prior to June 10, 1935, for honesty, integrity and good citizenship. On being told to answer the question by yes or no, he answered that he did not know anything about the defendant living out there; "it is just my business experience." The witness was then excused but later recalled and asked as to his business experience with the defendant and stated that he had known the defendant for thirty years, had done business with him during that time and had known him well during that time. He was then asked whether from his knowledge of the defendant and his dealings with him he knew the defendant's general moral character for integrity, good citizenship and honesty prior to June 10, 1935. The state objected to the testimony as incompetent, irrelevant and immaterial because the witness was not qualified for the opinion, and for the further reason that the question called for an opinion based upon facts which are not recognized in the law as amounting to a defense. The objection was overruled and the witness answered: "All I can say is all business transactions had with him were perfectly satisfactory." A motion to strike the answer was overruled. The witness was then asked, basing his answer on what he knew of the defendant, if he knew the defendant's general moral character for honesty, integrity and good citizenship, and an objection by the state to this question was sustained. He was then asked whether he would say that the defendant's moral character, from what he knew of him, was good or bad prior to June 10, 1935, and an objection of the state to this question was sustained. The appellee contends that there was no error in sustaining this objection, because (a) the question was not limited to the time immediately preceding the occurrence in question and the returning of the indictment; (b) because the witness disqualified himself from answering by his own direct examination; and (c) because there was no offer of proof made to show whether appellant's character was good or bad. The questions

asked show that they refer to a time prior to the indictment and we do not think that they should have been excluded because they did not expressly confine the time to the period covered by the occurrences in question up to the time of the indictment. It is true the witness stated that he did not know anything about the defendant living out there, apparently meaning at Union Mills, and that all he could say was that all business transactions he had with the defendant were perfectly satisfactory. He stated, however, that he had known the defendant for thirty years, that he was well acquainted with him and had done business with him during that time. He was not allowed to answer a question as to whether, basing his statement on what he knew of Ferguson, he knew his moral character for honesty, integrity and good citizenship, and he was not allowed to state from what he knew of the defendant whether his moral character was good or bad. It seems to be well settled in the law that a defendant can put his moral character in issue, as was apparently attempted to be done by this witness. 16 C. J. 580; State v. Donovan, 61 Iowa 278, 16 N. W. 130; State v. Lindley, 51 Iowa 343, 1 N. W. 484, 33 Am. Rep. 139; State v. Northrup, 48 Iowa 583, 30 Am. Rep. 408; State v. Turner, 19 Iowa 144; State v. Rutledge, 135 Iowa 581, 113 N. W. 461; State v. Johnson, 211 Iowa 874, 234 N. W. 263. It also seems well established that the good character offered by an accused may and must relate particularly to that trait of character which is involved in the crime charged. 16 C. J. 582; State v. Dexter, 115 Iowa 678, 87 N. W. 417; State v. Cather, 121 Iowa 106, 96 N. W. 722; State v. Wolf, 112 Iowa 458, 84 N. W. 536. It is true that in some jurisdictions witnesses are confined to testimony as to the general reputation of the defendant, and cannot testify as to what they know of the defendant, or as to his disposition, or give their opinion as to his character or disposition, from their personal observation or experience. 16 C. J. 583. In this state, however, the rule seems to be otherwise, and the real character of the defendant may be shown. This may be shown, it is true, by general reputation, but it may also be shown by what a witness knows of the defendant from his personal observation or experience with him. State v. Sterrett, 68 Iowa 76, 25 N. W. 936; State v. Cross, 68 Iowa 180, 26 N. W. 62; State v. Cather, 121 Iowa 106, 96 N. W. 722; State v. Richards, 126 Iowa 497, 102 N. W. 329. We think the testimony of the witness shows that he was sufficiently acquainted with the

defendant to be able to say whether the defendant's general moral character for honesty, integrity and good citizenship was good or bad and that he should have been allowed to do so. Appellee contends that the refusal to allow this witness to answer was in any event not prejudicial because no offer of proof was made to show whether defendant's character was good or bad. We think the examination of this witness sufficiently shows that the defendant was offering to prove by the witness what his general moral character was as to honesty, integrity and good citizenship. It seems to us that the traits of character concerning which the witness was interrogated were involved in the crime with which he was charged. No authority is offered by appellee to the contrary, and no authority is offered in support of the contention that it was necessary to make a further offer after the witnesses were not allowed to answer the questions put to them.

 VIII. Further errors are alleged to have been committed by the court in allowing two witnesses named Lloyd to testify in rebuttal that sometime in the latter part of May the defendant came to the Lloyd home about 3:30 o'clock in the morning and telephoned to Harold Phillips at New Sharon, at which time they heard him say over the telephone, in substance, that the deal was off, that they didn't get the cattle rounded up; in admitting the testimony of a witness, Clark, as to a conversation with Cleo Ferguson, a son of the defendant, which took place at the sales barn in Toledo, Iowa, on June 11th, the day on which the cattle were sold, in reference to changing the name under which the cattle were listed from Moore to Ferguson; and in admitting the testimony of the plaintiff's witness, Phillips, as to a conversation between the witness and Ben Ferguson, the defendant's son, on the night before Phillips claims to have gone to the defendant's place at Union Mills and hauled the cattle from there to Toledo. We think all of these matters were circumstances which, however slight, were relevant and material in establishing the chain of evidence against the defendant. There was nothing in any of this evidence which, in and of itself, amounted to an admission by the defendant or by anyone authorized to speak for him, and no such claim was made for it by appellee; but we think that the matters thus introduced in evidence were such that they might properly be considered by the jury in deter-

mining what, if any, connection the defendant had with the theft of the cattle which the state claims was committed by him.

IX. Appellant complains of the court's ruling in sustaining objections of the state to the cross-examination, by the defendant's attorney, of witnesses offered by the state to show that the appellant's reputation for general moral character and for honesty, integrity and good citizenship were bad prior to June 10, 1935. On cross-examination appellant's attorney asked these witnesses whether or not they had ever heard of the defendant being arrested prior to June 10, 1935, and on objection of the state the witnesses were not allowed to answer. Appellant then offered to show by the witnesses that, if allowed to answer, they would state that they had never heard of the defendant being arrested prior to June 10, 1935. Similar questions were asked the witnesses in regard to whether they had ever heard of the defendant taking a drink; whether they had known of him paying his debts; whether they would say that a man who does not drink, smoke, run around at night, and who attends church regularly, was not a man whose moral character was good. In State v. Gordon, 3 Iowa 409, 1. c. 415, the trial court permitted the state, on cross-examination of a witness for the defense, who had been called as to the good character of the defendant, to go into proof of particular facts or difficulties on the part of the defendant, and this court held that, in doing so, the trial court erred. Considering the question there raised this court said:

"It is evidence of *character,* which is admissible, which of course is to be confined to the trait of character which is in issue, or, as it is expressed by some of the writers, the evidence ought to have some analogy and reference to the nature of the charge. But the examination must be confined simply to the general character or reputation, and neither can ask questions as to particular facts or difficulties." (Citing cases.)

The rule announced in the Gordon case has been approved and followed in numerous cases in this state, and is the same as the rule in most, if not all, jurisdictions. See 22 C. J. 481, section 579; State v. Dexter, 115 Iowa 678, 87 N. W. 417. We find no error upon the part of the trial court in refusing to allow the defendant to go into the matters concerning which the witnesses were attempted to be interrogated.

For the reasons stated in Divisions IV and VII of the

1164

opinion, we feel constrained to hold that the court erred as to matters there considered, and that the case must be, and is hereby, reversed.—Reversed.

RICHARDS, C. J., and KINTZINGER, PARSONS, and HAMILTON, JJ., concur.